

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00434-CR

_____

ROBERT F. HALLMAN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1548964R

---

Before Womack, Wallach, and Walker, JJ.
Opinion by Justice Wallach
Dissenting Opinion by Justice Womack
Concurring Opinion by Justice Walker

## OPINION ON REMAND

## I. INTRODUCTION

This is a classic swearing match in a multiple-count sexual-abuse-of-children case involving the suspicious timing of outcries. Almost two years prior to Rita's[1] March 9, 2016 outcry, on August 10, 2014, a domestic dispute between Appellant Robert F. Hallman, his then-spouse Kim, and their eight-year-old son Ron resulted in Hallman and Kim giving written statements to the police. Their children—Ron, Amy, Rita, and Kelly—and some outside witnesses also spoke with the responding officers, who completed a family-violence packet that described the actions taken and everyone's demeanor that day. These documents show that no complaints of or allegations about sexual abuse of the children were raised by anyone that day. *See Hallman v. State* (*Hallman I*), 603 S.W.3d 178, 181–82, 185–86, 198 (Tex. App.—Fort Worth 2020), *vacated* (*Hallman II*), 620 S.W.3d 931 (Tex. Crim. App. 2021). Child Protective Services (CPS) became involved, and Hallman, who had been in and out of the family home over the course of several years, was charged with assault-family violence. Kim and the children moved into an apartment. Several months later, Hallman was allowed to visit the children and to drive Amy and Rita to their CPS-sponsored counseling appointments.

---

[1]We use pseudonyms for the complainants and their family members to protect the complainants' privacy.

Fast forward to March 6, 2016, when—after fighting with Rita and Kim—Amy decided to live with Hallman even though he was homeless and living in his truck. Three days later, Rita made an outcry of sexual abuse against Hallman, and he was arrested a month later while in class at Tarrant County College. Amy was found in his truck in the Tarrant County College parking lot. CPS interviewed her, and she was returned to Kim's custody. In May 2016, Kim filed for divorce but did not mention Rita's sexual abuse allegations in her divorce petition. *Id.* at 181, 197. Kim took possession of Hallman's truck, which had contained all of his and Amy's belongings, and she sold it to CarMax with Hallman's belongings inside.

After various delays, Hallman's trial on Rita's sexual-abuse allegations was set for Monday, February 13, 2017. However, Rita had become reluctant to testify. On February 12, 2017, the day before Hallman's trial date, Amy made her own sexual-abuse outcry against him, delaying Hallman's trial until 2018. *Id.* at 197.

Three Tarrant County judges presided over portions of Hallman's 2018 jury trial on whether he had sexually abused Rita and Amy: a magistrate judge presided over voir dire, a visiting judge heard the trial's guilt–innocence phase, and the elected judge of Criminal District Court No. 1 heard the trial's punishment phase.[2] At the conclusion of the trial's guilt–innocence phase, the jury acquitted Hallman of the most

---

[2]A defendant has no right to challenge a visiting judge in a criminal case, *Ndungu v. State*, No. 02-10-00298-CR, 2011 WL 3847446, at *2 & n.3 (Tex. App.—Fort Worth Aug. 31, 2011, no pet.) (mem. op., not designated for publication), and Hallman did not raise any such challenge.

serious charge—continuous sexual abuse of children (both Rita and Amy)—but convicted him of the remaining six offenses—two counts of aggravated sexual assault of a child under the age of fourteen, three counts of indecency with a child by contact, and one count of sexual assault of a child under the age of seventeen, all of which pertained solely to Amy. *Id.* at 181.

A failure on the part of the prosecution to disclose impeachment evidence—the family-violence packet and Kim's written statement from the August 10, 2014 incident that directly contradicted her trial testimony about whether she had spoken to the police that night about her concerns that Hallman had been sexually abusing Amy—came to light for the first time during the second day of the trial's punishment phase. Hallman requested a mistrial and alternatively asked the elected judge to review relevant portions of the guilt–innocence trial record or to let the visiting judge decide his motion for mistrial. The elected judge denied all of Hallman's requests.

Under the circumstances of this case, we hold that the elected judge's denial of the requested mistrial constituted an abuse of discretion, and the resulting harm affected Hallman's substantial rights. Accordingly, we reverse the trial court's judgment and remand the case for a new trial.

## II. BACKGROUND

We begin with a full recapitulation of the case's background and earlier proceedings in this court, followed by the case's review and remand by the Texas Court of Criminal Appeals.

### A. Prelude to the First Appeal

Until August 2014, Hallman had lived off-and-on with Kim and the children—Rita was the oldest, followed by Amy, Ron, and then Kelly. *Id.* During Hallman and Kim's tumultuous twenty-year relationship, they took turns calling the police on each other. *Id.* Kim called the police on August 9, 2014.[3] That day, the police told Kim that they could not make Hallman leave, so Kim took Rita, Ron, and Kelly and left for a few hours, while Amy stayed with Hallman.

On August 10, 2014, Rita and Ron called the police,[4] *id.* at 181–82, and Hallman was arrested for assaulting Kim. Kim secured a restraining order against Hallman, a CPS case was opened, and Kim and the children moved. As part of the CPS case, the children were ordered to attend weekly hour-long counseling sessions for four months, and Kim and Hallman unsuccessfully tried marriage counseling. Kim said that after Hallman was released from jail in October 2014, he went to live with his relatives and never lived with her and the children again. Kim and Hallman did not

---

[3]Kim testified that Hallman had called the police on her on that occasion, although a police officer testified otherwise based on the call detail incident report.

[4]Kim claimed that she had called the police on August 10, 2014.

get back together after the August 10, 2014 incident, although Hallman received visitation with the children after the CPS case closed, and he called CPS to check on them.

Over a year later, on March 6, 2016, Amy moved out of Kim's apartment to live with Hallman, who was homeless and living in his vehicle. Amy said that when she moved out, Kim told her that Hallman was going to prostitute her and that this cut her to the core because she knew it was not true.[5]

Three days after Amy left with Hallman, Rita made a delayed outcry, accusing Hallman of sexual abuse. A warrant was issued for Hallman's arrest two weeks later. He was arrested on April 7, and Amy was returned to Kim. *Id.* at 197. Kim filed for a divorce from Hallman in May 2016,[6] and the divorce was finalized a few months later. *Id.* at 181, 197.

In February 2017, the day before Hallman's trial was supposed to begin on Rita's sexual-abuse allegations, Amy made a delayed outcry of sexual abuse against Hallman, resulting in the trial's postponement and his indictment on new charges. *Id.*

Before trial, the State provided Hallman's defense counsel with a two-page notice of disclosure pursuant to Texas Code of Criminal Procedure Article 39.14 that

---

[5]During the defense's case, Kim denied having told Amy this.

[6]Kim initially testified that she had filed for divorce at the end of March 2016 but corrected her statement during cross-examination.

did not include thirteen pages of discovery regarding the August 10, 2014 incident between Hallman and Kim, who was one of the State's key witnesses.[7] *Id.* at 181.

After a jury was selected under the magistrate judge's administration, the visiting judge presided over the five-day guilt–innocence phase of trial. During that phase, several witnesses testified about the August 10, 2014 incident. *Id.* They testified that the incident began either when Amy tried to leave with Hallman and Kim tried to stop her, or when Hallman hit Ron during a dispute with Kim. *Id.* at 181–82. Kim claimed that she had "told the police on August the 10th, 2014, that [she] had suspicions that [Hallman] may have been sexually molesting [Amy]," and that an officer had pulled Amy aside separately and spoke with her. *Id.* at 182. Kim further testified,

> Q. Okay. So that's August the 10th of 2014, and your testimony is that on that date, you told the police -- do you remember what the police officer looked like?
>
> A. No. Because that was four, almost five years ago.
>
> . . . .
>
> Q. Okay. But you're saying that you told that police officer that you thought [Amy] was being sexually abused?
>
> A. Yes, I did.

---

[7]In addition to Kim's testimony, during the guilt–innocence phase of trial, the jury heard testimony from Rita, Amy, their older half-brother Martin, several police officers, a sexual assault nurse examiner, a forensic interviewer, a CPS investigator, a former CPS investigator, and a community college program coordinator. *Hallman I*, 603 S.W.3d at 181 n.2.

Q. Okay. And you're saying that the police officer talked to [Amy] about that; is that right?

A. Yes.

Q. Okay.

A. He pulled her to the side. She was upset. It wasn't the fact that she was taking sides. She was upset because she did not want [Hallman] to go to jail . . . . She was upset. She was not the only child upset that day. [Kelly], my baby, was upset also because she did not want [Hallman] to go to jail. She was also upset because he had assaulted me.

Q. Well, and in the end, the police did take [Hallman], right?

A. Yes.

Q. They arrested him?

Okay. And he was taken away from the house, right?

A. Yes.

Amy's testimony supported Kim's: Amy stated that the officers had asked her about whether Hallman had ever been abusive or sexually abusive to her and that she had told them no.

Kim also testified that Hallman had threatened her and the children, stating, "If we ever sent him to jail, it was a known fact, he told myself and the children, if we ever sent him to jail that he would kill all of us."

During the defense's case, Kim again reiterated that on August 10, 2014, she had told the responding officer about her concern that Amy was being sexually abused by Hallman. She agreed that she had testified that Hallman had threatened that

8

he would kill her if she sent him to jail but acknowledged that although she effectively had sent him to jail on August 10, 2014, they continued to see each other afterwards.

Then the defense called Crowley Police Detective Cesar Robles, who had worked for the Fort Worth Police Department on August 10, 2014, and who had been one of the two patrol officers who responded to the domestic-disturbance call that day. *Id.* Detective Robles stated that Kim had never told him or the other responding officer, Officer Oakley, that she was concerned that one of her children was being sexually abused and that if she had, they would have investigated. *Id.* During cross-examination by the prosecutor, Detective Robles testified that he had no independent recollection about the August 10, 2014 incident beyond what was contained in his offense report. *Id.* He did not remember what Amy, Kim, or Hallman looked like, and he did not recall whether they had been emotional that day. *Id.*

During the jury's deliberations, the jury sent out thirteen notes, requesting various exhibits and clarifications of testimony.[8] The jury acquitted Hallman of the most serious charge—continuous sexual abuse of children—but convicted him of the remaining six offenses that pertained solely to Amy. *Id.* at 181.

---

[8]On September 18, 2018, the visiting judge read the charge to the jury and then each side presented closing arguments before the jury began deliberations at 10:35 a.m. The jury was given a lunch break from 12:55 p.m. to 2:03 p.m., and then resumed deliberations from 2:03 p.m. to 5 p.m. The jury resumed deliberations the next day at 8:30 a.m. and announced a verdict at 10:37 a.m.

The punishment phase began under the elected judge the next day. During the second day of the punishment phase, the State disclosed thirteen pages of discovery pertaining to the August 10, 2014 incident: an affidavit by Detective Robles, handwritten statements by Hallman and Kim, and a family-violence packet. As we set out in our original opinion,

> The narrative in Detective Robles's August 10 offense report, which the parties used but did not offer into evidence during the guilt-innocence phase of the trial, stated that the 911 call details were that Kim and Ron had been hit in the face. Hallman told then-Fort Worth Police Officer Robles that Amy had wanted to leave with him and that Kim had followed them outside, grabbed Amy, and told her that she was not going anywhere and to go back inside the house. Amy told Hallman that she could not breathe, and Hallman grabbed Kim and tried to pull her away from Amy; he denied having hit Kim or anyone else in the process.

> According to the report narrative, Kim told Officer Oakley that Amy had tried to go with Hallman to a residence where narcotics were being used and that she told Amy she could not go and grabbed her by the arm. After Hallman punched her right arm and twisted her arm behind her back, Kim used her left arm to hit him in the head, and when Ron saw what was going on, he ran up and bit Hallman on the back. Kim told Officer Oakley that Hallman hit Ron in the face and the stomach. When Officer Oakley spoke with a neighbor, the neighbor told him that Hallman and Kim had been arguing in the street "as they always do," Hallman hit Kim on her arm and twisted her arm behind her back, and Ron came up and did something to Hallman's back. Hallman then "threw his arm back, and it was unclear if there was any contact made to [Ron] or not."

> According to the report's narrative, Kelly, Amy and Rita's younger sister, gave the same account to the police as Kim, while Amy gave the same account as Hallman, but when asked for more details, Amy "got upset and went inside the residence." The report stated, "When [Hallman] was given his chance to write his statement, he advised that [Ron] did bite him, but he did not hit [Ron] unless it was by accident."

10

*Id.* at 185. In her handwritten statement, Kim set out the following:

> This morning [Amy] was trying to leave with [Hallman] to go with him to his sister['s] house to smoke marijuana openly[.] I refused to let he[r] go in that environment with him. [Hallman] told her to run away. I went after her to the neighbor[']s house and asked her to come back home and I took her by her arm at the wrist and tried to pull her back and that's when Mr. Hallman hit me in my right arm and twisted my arms behind my back and when [Ron] seen him hit me h[e] tried to protect me and bit him and in return Mr. Hallman hit him in the face and stomach[.]

*Id.* at 186. Detective Robles's affidavit contained the same information as his offense report. *Id.* The offense report and Hallman and Kim's statements were admitted for record purposes as State's Exhibits 36, 37, and 38. *Id.* The family-violence packet, which was admitted for record purposes as part of Defense Exhibit 28, listed Kim and Ron as victims; Rita, Amy, Ron, and Kelly were listed as children who had seen the incident and were interviewed. *Id.* Rita's, Amy's, and Kelly's demeanors—contrary to Kim's testimony that the children had been upset—were check-marked as "calm." *Id.*

The family-violence packet also listed twenty-five items to describe the incident, with the instruction to check all that applied:

11

| | |
|---|---|
| Destroying Property | Offensive contact |
| Throwing Objects | Threat of Sexual Assault |
| Pushing/Shoving | Sexual Assault |
| Hitting with Fist (closed) | Grabbing |
| Slapping (open hand) | Restraining |
| Biting | Burning |
| Kicking | Scratching |
| Choking/Strangulation | Biting |
| Threat w/ Weapon | Cutting |
| Prevented from Leaving | Stalking |
| Threat of Retaliation | Used Weapon |
| Threat of Physical Violence | Homicide |
| | Other (List) |

The only items that received a check mark were "Hitting with Fist (closed)," "Grabbing," and "Restraining." Threats of retaliation, physical violence, and sexual assault were not marked. The family-violence packet notes also stated that Hallman was angry when the police arrived and that he had consumed marijuana and beer that evening and would be charged with assault-family violence and reckless injury to a child.[9]

> Defense counsel argued that as to Kim's written statement,
>
> there are inconsistencies with her testimony. So we were not allowed to question her. And her credibility -- our whole Defense was that it was the mother who put these children up to making these statements. And anything we could do to impeach her credibility was crucial to this case. And I'm looking at the statement and seeing that there are inconsistencies with her testimony.

---

[9]Hallman was not charged with injury to a child (Ron) arising from the August 10, 2014 incident.

So it is crucially relevant to this, despite the fact that it involved a separate offense. The -- 38.37 allows them to go into the entire relationship between the defendant and the alleged victims, and that was a crucial part. This August . . . 2014 offense involved [Amy] wanting to leave with [Hallman] creating this big ruckus, and that's when the whole family split apart. This was a crucial -- so this isn't just some extraneous offense that has no bearing on the facts of what he's -- he was charged with and what he's now been found guilty of after us not having the information with which to cross-examine her. It's very crucial to this case.

The prosecutor responded that the State was "not trying to hide anything."[10] *Id.* at 184.

---

[10]As we noted in our original opinion, the record reflects that before, during, and after the trial's guilt–innocence phase, defense counsel had difficulty obtaining access to information from the State. *Hallman I*, 603 S.W.3d at 183 n.3. For example, for access to CPS files involving Amy, the trial court held three hearings in August 2018 to ultimately discover that all but six minutes of a twenty-one-minute audio recording of a CPS interview conducted with Amy on April 7, 2016—the day of Hallman's arrest on Rita's allegations—was blank. Immediately before voir dire, the prosecutor informed the trial court that the State had given defense counsel "a new 39.14 discovery document" because "there was some new information that was scanned." *Id.*

During the guilt–innocence phase of trial, defense counsel objected to photographs of Amy and Rita at the ages they were when the alleged abuse occurred, stating, "That wasn't provided to us as far as I can tell." *Id.* The prosecutor responded that Kim had provided the photographs around a week before trial, "so I don't know if I provided it to [the defense] . . . since I've been gone for a week in Florida," but she added that the photos, albeit relevant, were "not evidence in the case as far as anything material to the case." *Id.* And when the defense objected to lack of notice about something that Amy called the "butt plug game" during her testimony, the prosecutor replied, "[I]t is in our notes and this has been open to the Defense." *Id.* The trial court overruled the objection but noted,

It's my understanding that the notice was general as to what activities had occurred and general as to the terminology to describe those activities. *And I will find that the notice that was given was adequate but only*

13

The trial judge ordered a two-hour recess for the defense to review the new materials and stated that the defense could recall any witnesses it felt necessary to conduct cross-examination based on the newly disclosed information. *Id.* The defense pointed out that Kim's cross-examination "needs to go back in time and take place during guilt/innocence, not punishment. There's nothing that can be done at this point with regard to the guilty verdicts that this jury has delivered."[11]

After the recess, the defense argued that it had put on Detective Robles's testimony "believing that the only information he had was contained in his offense report," that a large part of the case centered on Kim's credibility, and that if the defense had had Kim's August 10, 2014 written statement to the police that did not mention sexual abuse—contrary to her claim that she had expressed her concerns

---

*adequate, that a better practice would be to describe it more fully*, but I don't think the testimony, when matched against the notice given, would create any sort of surprise that would be unfair and does not comply with Michael Morton and the rest of the Code of Criminal Procedure and the statutory and case law requirements for disclosure. [Emphasis added.]

*Id.* On the same day that the State disclosed the thirteen pages at issue during the punishment trial, the State also provided to the defense an offense report from a 1999 burglary of a habitation used to indict Hallman as a habitual offender. *See id.* Defense counsel pointed out that the document showed that Kim had pawned the burgled item and had been a potential codefendant in the case, which "is another piece of information that perhaps could have become relevant during the trial of this case and we were denied that."

[11]Because of the disclosure's timing—after Hallman had already been convicted—this is not a situation in which a separate offer of proof, *see* Tex. R. Evid. 103, or bill of exception, *see* Tex. R. App. P. 33.2, would have made a difference.

about such abuse to the officers—Hallman would have had "a far different cross-examination" of her. *Id.* at 186. Defense counsel requested a mistrial and asked, alternatively, that either the guilt–innocence visiting judge be allowed to preside over the mistrial decision or that a continuance be granted so that the elected judge, who had not been present during the five-day guilt–innocence trial, could review the pertinent portions of the trial record. *Id.*

The trial court denied the defense's requests, observing that after comparing the information contained in Detective Robles's offense report to Hallman's and Kim's written statements, "the essential information from those two statements is contained" in the offense report. *Id.* She also noted that the August 2014 extraneous offense involved Kim—not Rita or Amy—as the victim and was not the offense for which Hallman was being tried, and she concluded that for purposes of Article 39.14, the statements were "not material in that their omission would not create a reasonable doubt that did not otherwise exist." *Id.* at 186–87.

Defense counsel urged reconsideration, stating,

I know the Court did not hear this case, but I would point out that our crux was that [Kim] was not telling the truth, and this could have and I believe would have made a difference. The jury deliberated for some nine hours on this matter, actually acquitted him of count one. So we don't really know and we will never know whether or not these items could have made a difference. He's denied due process in this case, Your Honor, and . . . [w]e'd ask the Court to note our exception.

The trial court responded,

15

And, once again, the Court is not ruling that everything contained in State's Exhibit 36 [the offense report] is not relevant and not material, but the Court is merely ruling that there is not additional information in State's Exhibits 37 [Hallman's written statement] and 38 [Kim's written statement] that are not contained in State's Exhibit 36, and that is the Court's ruling.

*Id.* at 187.

The jury assessed Hallman's punishment at life imprisonment for each of the six convictions,[12] and the trial court set the sentences to run concurrently. *Id.* at 181.

## B. The First Appeal

---

[12]Kim and Hallman each testified during the punishment phase. Kim testified that Hallman had physically abused her and the children, that she had seen him strike Rita, and that she had seen an incident when he had hit Rita very hard on her back. She testified that when she asked him about his actions, he told her that "those are his kids. He'd discipline them the way he wanted to discipline them, and he didn't have to answer [her] questions." She also testified that his drug of choice was crack cocaine.

Hallman testified that on August 10, 2014, Kim had "start[ed] with these crocodile tears . . . and the next thing you know I'm going to jail for assault and injury to a child." He denied having ever threatened to kill his family if they sent him to jail, denied having sexually abused Amy or Rita, and claimed that Kim's family had put Amy and Rita up to lying. He stated, "If I would have called the police and let the police know that [Kim] assaulted [Amy in March 2016], I wouldn't even be here." He said that when Amy and Kim had gotten into the altercation, Kim had pulled out Amy's weave and "left a big plug in her hair right there, and she scratched her on the forehead." He denied smoking marijuana with Amy and Rita and denied having a drug problem, stating, "I've never used drugs in my life."

Paul Rojas, who maintained criminal records for the Tarrant County Sheriff's Department Error Resolution Office, and Jerry Rucker, records custodian for the Tarrant County Sheriff's Office, testified about Hallman's prior convictions and disciplinary issues while in jail. Hallman had been convicted of burglary of a building in 1986, felony theft in 1992, assault–bodily injury in 1994, burglary of a habitation and forgery in 1999, fleeing from a police officer in 2013, and assault–family violence in 2014 (which arose from the August 10, 2014 incident involving Kim).

16

In his initial appeal in this court, Hallman complained that the trial court had abused its discretion by denying his request for a mistrial, arguing that the State had violated Article 39.14's discovery requirements. *Id.* at 187. We agreed, observing that the State's failure to disclose Kim's written statement to the police before or during the guilt–innocence phase of the trial had deprived Hallman of the opportunity to fully develop his defensive theory that Kim, Amy, and Rita were lying. *Id.* at 199. That is, we concluded that the late-revealed evidence was "material" under Code of Criminal Procedure Article 39.14, applying the analysis under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). *See Hallman I*, 603 S.W.3d at 199–200; *see also Hallman II*, 620 S.W.3d at 931. We sustained Hallman's sole point, reversed the trial court's judgment, and remanded the case for a new trial. *Hallman I*, 603 S.W.3d at 199–200. The State then filed a petition for discretionary review.

## C. The State's Petition for Discretionary Review

In its petition for discretionary review, the State complained that we had erred in our application of *Brady*'s materiality prong and that our analysis had overvalued Kim's testimony and had undervalued the State's evidence supporting the verdict. The State also complained that, as a threshold matter, we had failed to afford appropriate deference to the trial court's mistrial ruling.

## D. Remand for Reconsideration

On April 21, 2021, the Court of Criminal Appeals construed our opinion as having "deemed the late-revealed evidence to have been 'material' in contemplation of

17

Article 39.14(a), as amended by the Michael Morton Act." *Hallman II*, 620 S.W.3d at 931. The court vacated our judgment and remanded the case to us "for further consideration and disposition consistent with" *Watkins v. State*, 619 S.W.3d 265 (Tex. Crim. App. 2021). *Hallman II*, 620 S.W.3d at 931–32.

## E. Inapplicability of Subsection (a)

Article 39.14(a) provides as follows:

> Subject to the restrictions provided by Section 264.408, Family Code, and Article 39.15 of this code, as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence *material to any matter involved in the action* and that are in the possession, custody, or control of the state or any person under contract with the state. The state may provide to the defendant electronic duplicates of any documents or other information described by this article. The rights granted to the defendant under this article do not extend to written communications between the state and an agent, representative, or employee of the state. This article does not authorize the removal of the documents, items, or information from the possession of the state, and any inspection shall be in the presence of a representative of the state.

Tex. Code Crim. Proc. Ann. art. 39.14(a) (emphasis added). In *Watkins*, the Court of Criminal Appeals considered the meaning of Subsection (a)'s phrase "material to any

18

matter involved in the action." 619 S.W.3d at 268.[13] It construed Article 39.14(a) as adopting the ordinary definition of "material" and held that evidence is "material" if it has "some logical connection to a consequential fact." *Id.* at 269. Under *Watkins*, then, whether evidence is "material" under Article 39.14(a) is to be determined by evaluating its relation to a particular subject matter rather than its impact upon the overall determination of guilt or punishment in light of the evidence introduced at trial.[14] *Id.* at 269, 280. The *Watkins* definition of materiality "significantly differs from

---

[13]In *Watkins*, the court noted that Michael Morton's wrongful conviction had "provided a significant spark the Legislature needed to completely change criminal discovery in Texas," which had been primarily left to a trial court's discretion before Morton spent twenty-five years in prison for a crime he did not commit because a prosecutor had withheld material, exculpatory evidence. 619 S.W.3d at 274–75.

[14]In *Watkins*, the appellant's attorney timely requested disclosure of "any other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the case" under Article 39.14, as well as notice of the State's intent to offer extraneous offenses. 619 S.W.3d at 268–69. The prosecutor provided notice of the State's intent to introduce evidence of prior convictions—including the two alleged in the indictment as prior and sequential felony offenses—and extraneous offenses at punishment but did not disclose the thirty-four exhibits consisting of booking records, pen packets, and judgments until time to introduce them at punishment. *Id.* The defense objected to the lack of disclosure, and the trial court initially sustained the defense's objection but later allowed the evidence to be admitted. *Id.* at 269–70.

The appellant asked the Court of Criminal Appeals to interpret "material" as synonymous with "relevant." *Id.* at 271. The court did so, drawing a bright line between how courts should analyze Article 39.14 violations and *Brady* violations. *Sopko v. State*, 637 S.W.3d 252, 256 (Tex. App.—Fort Worth Dec. 16, 2021, no pet.) (citing *Watkins*, 619 S.W.3d at 277, 288); *cf. Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (reciting that evidence is "material" under *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"); *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–

19

'indispensable' or probably causing 'a different outcome.'" *In re El Paso Cnty. Pub. Def.*, No. 08-19-00296-CR, 2021 WL 3260629, at \*7–8 (Tex. App.—El Paso July 30, 2021, orig. proceeding) (not designated for publication) (observing that the *Brady* materiality standard is not affected by *Watkins*'s statutory construction of Article 39.14's materiality).

> In contrast to Subsection (a), Subsection (h) of Article 39.14 states that
>
> [n]otwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, *impeachment*, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.

Tex. Code Crim. Proc. Ann. art. 39.14(h) (emphasis added). In *Watkins*, the court noted that Subsection (h) places upon the State "a free-standing duty to disclose" such evidence, which is "much broader than the prosecutor's duty to disclose as a matter of due process under *Brady v. Maryland*." 619 S.W.3d at 277. It creates "an independent and continuing duty for prosecutors to disclose evidence that may be favorable to the defense even if that evidence is not 'material.'" *Id.*

---

97 (focusing on materiality as to guilt or punishment). The court concluded that the complained-of exhibits were "material" because they had a "logical connection to a consequential fact." *Watkins*, 619 S.W.3d at 273, 290–91. Accordingly, it held that the State had erred by failing to produce the exhibits before trial in violation of Article 39.14(a), reversed the intermediate court's decision, and remanded the case to the intermediate court to conduct "the proper harm analysis." *Id.* at 269, 291.

20

The thirteen pages that were not disclosed by the State until the punishment phase of trial are impeachment evidence. Accordingly, Subsection (h) controls, rather than Subsection (a) and *Watkins*'s materiality definition.

## F. Additional Briefing on Remand

After receiving this case on remand, we requested additional briefing. Hallman argued in a single point, "Error and harm have been found by this court under the higher *Brady* standard, thus remain under *Watkins*." In its remand brief, the State "agree[d] that the evidence should have been disclosed," adding that "there is no dispute that had a proper request been made, the family-violence packet would be relevant under Article 39.14(a)" but that it—as we note above—"also qualifies as impeachment evidence under 39.14(h)."[15] We then requested and received supplemental briefing on "the proper harm analysis," which was referenced, but not described, in *Watkins*, *see id.* at 291, and we requested and received oral arguments.

Not long after oral arguments in this case were completed, we addressed the proper-harm-analysis question presented by Article 39.14 in *Sopko* and concluded that the appropriate harm analysis for such a statutory violation still falls under Texas Rule

---

[15]The State contends in its brief on remand that Hallman did not make a proper request for evidence under Article 39.14(a) but acknowledges in its supplemental brief on remand that it had a statutory duty under Article 39.14(h) to disclose impeachment evidence. The State nonetheless claims that the late disclosure of the thirteen pages was harmless.

of Appellate Procedure 44.2(b).[16] *See* 637 S.W.3d at 256–57. But the actual error presented here is whether the trial court abused its discretion by denying Hallman's motion for mistrial on the Article 39.14(h) violation.

## III. DISCUSSION

To determine whether the trial court abused its discretion, we must consider the current state of the law on multiple judges in the same case.

### A. Current State of the Law on Multiple-Judge Cases

The Court of Criminal Appeals has stated that it is proper for a different judge from a trial's guilt–innocence phase to preside over a punishment hearing. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984);[17] *Hogan v. State*, 529 S.W.2d 515,

---

[16]*Sopko* involved the disclosure of discovery during probation revocation in an assault case. 637 S.W.3d at 254. In that case, we noted that the appellant had already been aware of both the video of the assault and the complainant's written statement before the revocation hearing because it was produced to him when he originally pleaded guilty. *Id.* at 257–59; *see Williamson v. State*, No. 04-20-00268-CR, 2021 WL 4976326, at *3–4 (Tex. App.—San Antonio Oct. 27, 2021, pet. ref'd) (mem. op., not designated for publication) (applying Rule 44.2(b) to Article 39.14 violation); *see also Thurman v. State*, Nos. 01-19-00833-CR, -00834-CR, 2021 WL 3160632, at *5–6 (Tex. App.—Houston [1st Dist.] July 27, 2021, no pet.) (mem. op., not designated for publication) (applying *Watkins* "materiality" standard); *Perkins v. State*, No. 03-19-00356-CR, 2021 WL 2172547, at *3 (Tex. App.—Austin May 28, 2021, no pet.) (mem. op., not designated for publication) (noting that "[r]eviewing courts must conduct a harm analysis before determining whether reversal is proper for violation of article 39.14"); *Rodriguez v. State*, 630 S.W.3d 522, 524–25 (Tex. App.—Waco 2021, no pet.) (discussing preservation of error under Article 39.14); *Rodriguez*, 630 S.W.3d at 528–30 (Gray, C.J., concurring) (same).

[17]In *Jackson*, a sexual-abuse-of-a-child case, the court held that a punishment decision by a different sitting judge would not be disturbed on appeal absent a showing of abuse of discretion and harm. 680 S.W.2d at 814. The appellant pleaded

22

517 (Tex. Crim. App. 1975). It has likewise stated that "it is not improper for different judges to sit at different hearings in a case, and this holds true, absent an abuse of discretion, even if an objection is made." *Woods v. State*, 569 S.W.2d 901, 903 (Tex. Crim. App. 1978); *see Eyman v. State*, No. 13-15-00589-CR, 2017 WL 3634058, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 24, 2017, no pet.) (mem. op., not designated for publication) (holding no ineffective assistance of counsel when attorney failed to object to a visiting judge's hearing the guilt–innocence and punishment phases of his trial after presiding judge heard voir dire and opening statements but was unable to continue with trial due to family emergency); *Clay v. State*, 390 S.W.3d 1, 15 (Tex. App.—Texarkana 2012, pet. ref'd) (holding no abuse of discretion when visiting judge, who replaced ill presiding judge on day of charge

---

not guilty and his bench trial began in December 1979 before the elected judge, who found him guilty. *Id.* at 810–11. Defense counsel asked to postpone the punishment hearing and for a presentence investigation report (PSI) to be prepared because the appellant was seeking probation. *Id.* at 811. The elected judge accordingly deferred judgment on punishment pending the PSI's preparation. *Id.* The elected judge died before he could assess punishment, and another judge entered a judgment in January 1981, assessing the appellant's punishment at eight years' confinement. *Id.* The new judge did so after a proceeding during which neither the State nor the defense offered any evidence and after overruling the appellant's objection that the subsequent judge had assessed his punishment without reviewing a transcript of the guilt–innocence evidence and by assessing his punishment based solely on the PSI. *Id.* The court held that this was error because—at the time—punishment could not be assessed solely on a PSI, and it remanded the case for a new punishment trial. *Id.* at 814 (referencing the effective date of the 1981 amendment to Code of Criminal Procedure Article 37.07, Section 3(d), which allowed the trial court to order a PSI and consider it with other evidence in assessing punishment).

conference and closing arguments, denied continuance requested by defense);[18] *cf.* Fed. R. Crim. Proc. 25 (providing that any judge regularly sitting in or assigned to the court may complete a jury trial if (1) the judge before whom the trial began cannot proceed because of death, sickness, or other disability; and (2) the judge completing the trial certifies familiarity with the trial record, and that after a verdict or finding of guilty, any such judge may complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability; the successor judge may grant a new trial if satisfied that a judge other than the one who presided at the trial cannot perform the post-trial duties or a new trial is necessary for some other reason).

Different judges may sit because defendants are not entitled to the judge of their choice. *See Sanchez v. State*, 124 S.W.3d 767, 769 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Jackson*, 680 S.W.2d at 814); *see also Sheffer v. State*, 2-09-133-CR,

---

[18]In *Clay*, defense counsel objected to the judicial substitution and requested a continuance because the visiting judge—having not presided over the trial—was not familiar with jury selection, opening statements, or any testimony or evidence in the case. 390 S.W.3d at 14–15. He argued that the substitution was improper "because we don't see how the Court could make any rulings during arguments on evidence within or outside the record and how far counsel might stray from that evidence, making the Court flying blind, so to speak." *Id.* at 15. Although the appellant cited a few examples in the State's closing arguments where he claimed the prosecutor had mischaracterized the facts and questions asked during trial, he failed to cite any authority to support his argument that the trial court had abused its discretion by denying the motion for continuance, and he did not argue that the trial court had erred by overruling his objections to the State's alleged mischaracterizations. *Id.* at 15 & n.9. The appellate court accordingly found that the trial court was within its discretion to deny the motion. *Id.* at 15.

2009 WL 3943419, at *4 (Tex. App.—Fort Worth Nov. 19, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that the visiting judge did not abuse his discretion by refusing to allow the appellant to withdraw his guilty plea when the appellant was not entitled to the judge of his choice and had pointed to no specific reason why the elected judge would have decided his punishment differently than the visiting judge). Nonetheless, a defendant is entitled to a fair trial, i.e., one in which any nonconstitutional errors do not affect his substantial rights, *see* Tex. R. App. P. 44.2(b), and in which incurable prejudice is remedied through the granting of a mistrial, *see Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).[19]

---

[19]As a former appellate justice on this court has observed,

> Unlike trial judges, who primarily see only the conduct in the courtrooms over which they preside, appellate courts are presented with records from other courts in that county as well as other courts in other counties within that appellate district. Appellate judges are in a better position than trial judges to see patterns of conduct. Consequently, appellate judges have an obligation to speak up when observed patterns show a course of conduct at odds with constitutional mandates and fundamental fairness.

*Ex parte Roberson*, 455 S.W.3d 257, 263–64 (Tex. App.—Fort Worth 2015, pet. ref'd) (Dauphinot, J., dissenting). In recent years, it appears to have become a pattern in Tarrant County to engage visiting judges for various portions of a trial. *See, e.g., Serrano v. State*, 636 S.W.3d 717, 724 n.4 (Tex. App.—Fort Worth 2021, pet. ref'd) (noting visiting judge presided over guilt–innocence jury trial but that elected judge decided punishment); *Casas v. State*, 524 S.W.3d 921, 924 n.3 (Tex. App.—Fort Worth 2017, no pet.) (noting visiting judge presided over suppression hearing and signed community-supervision order); *Ex parte Cross*, No. 02-12-00417-CR, 2013 WL 709124, at *1 (Tex. App.—Fort Worth Feb. 28, 2013, no pet.) (per curiam) (mem. op., not designated for publication) (noting visiting judge presided over DWI trial and elected judge initially granted motion for new trial).

As pointed out by the State during oral arguments, we may not conduct a de novo review merely because there are different judges involved, *see Ex parte Wheeler*, 203 S.W.3d 317, 325 (Tex. Crim. App. 2006), and whether an abuse of discretion occurs depends primarily on the case's circumstances, *cf. State v. Zalman*, 400 S.W.3d 590, 593 n.4 (Tex. Crim. App. 2013) (failing to reach the question of whether a visiting judge abused her discretion by granting a new trial without first familiarizing herself with the trial's facts, evidence, and proceedings).

For example, in *Wheeler*, a visiting judge granted a defense-requested mistrial in a month-long manslaughter case involving a pedestrian death after the prosecutor asked the defense's expert if he was aware that the defendant's insurance carrier had found her at fault. 203 S.W.3d at 319–21. Immediately after the prosecutor asked the question, the visiting judge sent the jury out and asked the defendant's attorneys if they wanted a mistrial after they argued that the State had violated a motion in limine and "made a statement unsupported in bad faith to create a mistrial in this case."[20] *Id.* at 321. The visiting judge recessed the case to review the issues over the weekend and then heard arguments the following Monday before granting the mistrial. *Id.*

The elected judge subsequently denied the defendant's habeas corpus application in which the defendant claimed that a second trial was barred by double

---

[20]The Court of Criminal Appeals acknowledged that the visiting judge "reasonably concluded that once this skunk was in the jury box, there was no way to hide the smell." *Wheeler*, 203 S.W.3d at 325.

jeopardy. *Id.* at 319. Before making that ruling, the elected judge stated that she had been in daily contact with the visiting judge during the trial, so she understood the issues, and that she had the "benefit of a letter as well as legal case law that he left [her] when he left town[,] stating the reasons for his rulings, and quite frankly, some opinions that he seemed to have on the issue." *Id.* at 321. During the hearing on the habeas application, the State called no witnesses, but the defense offered various exhibits into evidence, and the elected judge questioned the prosecutor extensively about his reasons for asking the offending question, why he thought the question was a proper one, why he thought his question did not violate Rule of Evidence 411, and why he thought the defense had opened the door to the insurance-investigation results. *Id.* at 321–22. She also reviewed the transcript of the defense expert's testimony. *Id.* at 322.

This court held that the elected judge had erred by denying habeas relief,[21] but the Court of Criminal Appeals reversed our decision, stating that although it agreed with us that the prosecutor's question was manifestly improper and that the prejudice that it caused could not be cured by an instruction to disregard, making mistrial appropriate, *id.* at 319, 324–25, 330, we had failed to assess the objective facts "in the

---

[21]*See Ex parte Wheeler*, 146 S.W.3d 238, 242 (Tex. App.—Fort Worth 2004), *rev'd*, 203 S.W.3d at 320. We originally reversed the denial of habeas relief in 2001, but the Court of Criminal Appeals vacated that judgment and remanded the case to us for further review. *See Ex parte Wheeler*, 61 S.W.3d 766, 769 (Tex. App.—Fort Worth 2001), *judgm't vacated*, 122 S.W.3d 170 (Tex. Crim. App. 2003).

light most favorable to the trial court's ruling" on the habeas application, *id.* at 319, 322, 325. That is, we had instead employed a de novo review of the facts "because the trial judge who conducted the habeas hearing was not the same judge who presided over the trial and granted the mistrial." *Id.* at 325. The Court of Criminal Appeals disagreed, stating that the elected judge properly had before her the question of the prosecutor's intent.[22] *Id.*

The court pointed out that the elected judge had personally presided over the habeas hearing and "was well-positioned to make credibility decisions." *Id.* at 326; *see* 75 Am. Jur. 2d Trial § 154 (observing that "[t]he more the case depends on the credibility, and especially the demeanor, of the witnesses, the more a substitute judge needs to do to become adequately familiar with it. Becoming adequately familiar does not always require the reading of a transcript, although a transcript will often be helpful, and sometimes essential."). The elected judge had been in daily communication with the visiting judge during the trial and had his materials, and she had quizzed the prosecutor extensively concerning his reasons for asking the offending question. *Wheeler*, 203 S.W.3d at 326. "She could gauge [the prosecutor's] credibility and demeanor during this face-to-face colloquy." *Id.* (observing that the presiding judge might also "have had prior knowledge of this prosecutor, and her

---

[22]That is, *Wheeler* did not involve a scenario in which the trial court had heard no evidence and was thus in no better position than the court of appeals to determine error and harm.

28

assessment of his credibility could well be based upon those prior experiences as well as the cogency and genuineness of his explanation"). The record also reflected that she had not made a hasty or ill-informed ruling but rather had both the transcripts of the pertinent trial excerpts and the mistrial hearing and had researched the double-jeopardy issue. *Id.* The court stated, "This was a trial judge who was exercising her discretion carefully and cautiously, not one who was making an 'off-the-cuff' ruling." *Id.* The court concluded that the objective facts did not show that she had abused her discretion in concluding that the prosecutor had honestly (although misguidedly) thought that his question was permissible. *Id.* at 326–27.[23] The court observed, "Factually, this is a close case, and, had the trial judge ruled that double jeopardy *did*

---

[23]The court walked through each of the six factors set out in *Ex parte Peterson*, 117 S.W.3d 804 (Tex. Crim. App. 2003), which clarified the Texas double-jeopardy analysis. *Wheeler*, 203 S.W.3d at 327–30. The *Peterson* factors are whether the trial was going badly for the State, whether the State repeated its misconduct despite the trial court's admonitions, whether the prosecutor provided a reasonable "good faith" explanation for the conduct, whether the conduct was "clearly erroneous," whether there was a plausible basis for the prosecutor's conduct, and whether the prosecutor's actions leading up to the mistrial were consistent with inadvertence, lack of judgment, or negligence or whether they were instead consistent with intentional or reckless misconduct. *Id.* Based on the record, the court concluded that at the time of the mistrial, the case had been an "evidentiary 'neck-and-neck' horse race"; there was no other misconduct; there was no indication anywhere in the record that the prosecutor did not sincerely, but mistakenly, believe that the expert had reviewed the insurance report; the conduct was "clearly erroneous" to both the visiting and elected judges; the area of inquiry was appropriate even though the specific question was entirely inappropriate; and while the visiting judge assessed no intentional or reckless fault against either side, "he might well have taken into account the rising tempers and trial fatigue by both sides as contributing to the prosecutor's final, fatal question" in the hotly contested trial. *Id.*

bar any retrial, we would, of course, uphold that ruling as well," deferring to the trial court's factfinding because—on this record—rational people could "differ about whether, given these facts, it is a reasonable inference that the prosecutor" was intentionally goading the defense into asking for a mistrial or acting with conscious disregard of a substantial risk that the trial court would be required to declare a mistrial. *Id.* at 330.

We must generally defer to any trial-level evidentiary ruling that falls within the zone of reasonable disagreement, and in the absence of any specific fact findings on the record, we must assume that the trial court resolved all fact issues in a way that is consistent with its ultimate ruling if those presumed findings are supported by the record. *Francis v. State*, 428 S.W.3d 850, 855 (Tex. Crim. App. 2014) (reviewing trial court's ruling to exclude evidence because of willful prosecutorial defiance of a discovery order under an abuse-of-discretion standard);[24] *cf. State v. Caraway*, No. 11-

---

[24]In *Serrano*, for example, we noted that a visiting judge had presided over the guilt–innocence phase of an appellant's jury trial, while the elected judge, at the appellant's option, had decided punishment. 636 S.W.3d at 724 n.4. The jury had convicted the appellant of felony evading arrest or detention with a vehicle, and the elected judge had assessed his punishment at twenty-five years' confinement. *Id.* at 720. On the second day of the punishment trial, the trial court admitted into evidence a PSI, and the State re-offered "everything that [was] already in evidence" from the guilt–innocence phase and from the first day of the punishment trial. *Id.* at 724. The trial court "[g]ranted the re-offer." *Id.* The elected judge stated that he intended to review the guilt–innocence reporter's record and stated that he had watched the video of the chase. *Id.* at n.4. On appeal, the appellant did not complain that the trial court did not review the guilt–innocence reporter's record or challenge the trial court's ruling granting the State's re-offer of the guilt–innocence evidence. *Id.* We held that the video depicting the appellant's driving provided ample evidence to support the

99-00152-CR, 2000 WL 34235106, at *3 (Tex. App.—Eastland June 22, 2000, no pet.) (not designated for publication) (holding visiting judge abused discretion by granting new-trial motion when elected trial judge did not err by refusing the appellant's request, which was unsupported by evidence in the record, for lesser-included-offense instructions).

In contrast, a mixed question of law and fact results in deference to the trial court only when the resolution turns on an evaluation of credibility and demeanor. *See State v. Ambrose*, 487 S.W.3d 587, 596 (Tex. Crim. App. 2016) (referencing *Guzman* suppression standard in reviewing charge error). "An appellate court owes no deference to a trial court's determinations when they are actually determinations as to questions of law or mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor." *Id.*; *cf. Oprean v. State*, 201 S.W.3d 724, 727–28 (Tex. Crim. App. 2006) (holding that visiting judge abused his discretion by admitting videotape of defendant's prior DWI conviction over defense's objection during punishment phase when, although visiting judge might not have been aware of pretrial discovery order until defense called it to his attention, the unambiguous order was part of the record before him and the prosecutor's conduct presented a calculated

trial court's findings that he drove recklessly, dangerously, or both, and that his driving put others in actual danger of serious bodily injury or death. *Id.* at 727. We upheld the sufficiency of the evidence to support the trial court's deadly-weapon finding. *Id.*

31

effort to frustrate the defense).[25] While cases addressing the State's violation of discovery orders by willfully or negligently withholding evidence are not directly on point here,[26] *see Francis*, 428 S.W.3d at 854–55, they are instructive in how we review

[25]In *Oprean*, the Court of Criminal Appeals held that whether a prosecutor intended to willfully disobey a discovery order could be inferred from the prosecutor's words and actions. 201 S.W.3d at 728. Specifically, it considered whether the record indicated that the prosecutor had intended to harm the defense, whether the prosecutor's actions were a strategic and purposeful effort to thwart the defense's preparation of its case, and whether the prosecutor consciously decided to violate the plain directive of a discovery order, as well as the validity of the prosecutor's rationale and explanation for violating the discovery order and whether the prosecutor suddenly discovered the evidence such that compliance with the discovery order's terms became impossible. *Id.* at 726–28.

[26]For example, if the State fails to disclose a witness on its witness list and the trial court allows that witness to testify, we review that decision for an abuse of discretion, considering whether the State's actions in calling the previously undisclosed witness constituted bad faith and whether the defendant could have reasonably anticipated that the undisclosed witness would testify. *Hamann v. State*, 428 S.W.3d 221, 227–28 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000)). The principal area of inquiry as to bad faith is whether the defense shows that the State intended to deceive the defendant by failing to provide the defense with the witness's name. *Id.* at 228. In examining whether the defense could have reasonably anticipated that the State would call the witness, a reviewing court generally examines the degree of surprise to the defendant; the degree of disadvantage inherent in that surprise (i.e., whether the defendant was aware of what the witness would say or whether the witness testified about cumulative or uncontested issues); and the degree to which the trial court was able to remedy the surprise (i.e., by granting the defense a recess, postponement, or continuance, or by ordering the State to provide the witness's criminal history). *Id.*

Extreme negligence or even recklessness on the prosecutor's part in failing to comply with a discovery order will not, standing alone, justify the sanction of excluding relevant evidence. *Francis*, 428 S.W.3d at 855. In *Francis*, the indictment alleged that the appellant had robbed the complainant—a woman with whom he was living—by threatening her and placing her in fear of imminent bodily injury and death using a deadly weapon (a knife). *Id.* at 852. Three and a half months before trial, the

whether the trial court abused its discretion by denying Hallman's motion for mistrial,

*see Byrd v. State*, No. 02-15-00288-CR, 2017 WL 817147, at *4 (Tex. App.—Fort

Worth Mar. 2, 2017, pet. ref'd) (mem. op., not designated for publication) (citing

---

trial court signed a discovery order that required the State to provide the defense with an opportunity to inspect all physical objects to be introduced in the State's case and all weapons seized or acquired by the State in its offense investigation. *Id.* On the first day of trial, after the jury had been selected, defense counsel noticed a large machete among the physical items the State intended to introduce. *Id.* He immediately complained to the trial court that the pleadings referenced a knife, not a machete. *Id.* The prosecutor replied that there were two knives used that night. *Id.* The next morning, the defense sought a continuance and asked the trial court to allow investigation into the machete to formulate a defensive strategy. *Id.* The trial court granted the motion and noted in its written order that defense counsel was being given the opportunity to inspect the machete and confer with his client. *Id.*

During a hearing before the trial court, the prosecutor stated that she had received the machete from the complainant the month before trial, when she went to interview the complainant; that she had thought defense counsel knew about the machete; that she had thought it was in the offense report (it was not); and that it had been mentioned in the State's file by the case's previous prosecutor. *Id.* at 853. Defense counsel argued that the machete's belated revelation acted as a surprise and affected the defense's ability to cross-examine the responding officer and counselor who had previously testified because part of the defense's theory was that the defendant did not have a weapon. *Id.* at 854. The trial court declined to exclude the machete from evidence and allowed the complainant to talk about it. *Id.* The court held that it was no abuse of discretion for the trial court to have credited the prosecutor's denials and thus to have rejected the inference that her conduct had been a calculated effort to frustrate the defense. *Id.* at 856–57. Further, as to exclusion of evidence as a function of due process when the State's conduct is less culpable than willfulness, the appellant in *Francis* failed to show that he was prejudiced pretrial by contending that his ignorance of the machete caused him to forgo a favorable plea bargain; it was not evident how the tardy revelation of the machete's role in the State's case substantially impaired the appellant's actual defensive posture at trial when he was still able to substantially impeach the complainant; and the appellant did not otherwise explain how his defensive posture could have materially improved had he been alerted to the machete's significance earlier. *Id.* at 859–60.

*Francis*, 428 S.W.3d at 859–60, for the proposition that to establish a due-process violation from untimely discovery, a defendant must show pretrial prejudice, substantial impairment to his defensive posture at trial, and an explanation of how that defensive posture could have been materially improved with proper and timely discovery).

## B. The Parties' Arguments

### 1. Hallman's Argument

As he did in his original appeal, Hallman argues that the trial court erred by denying his requested mistrial when the State failed to disclose the thirteen pages before the trial's punishment phase. He claims that the deference typically accorded to a trial court is inapplicable here because the ruling was based on testimony that the elected judge did not hear and that the following also demonstrates an abuse of discretion because: (1) Kim's undisclosed handwritten statement and the undisclosed family-violence packet responses were proof that she had lied under oath during the trial's guilt–innocence phase; (2) the State capitalized on Detective Robles's undisclosed affidavit and the undisclosed family-violence packet to impeach Detective Robles's credibility when he testified about his lack of recollection outside of the offense report; (3) the undisclosed family-violence packet would have refuted the false impression left with the jury by the State that the children had been upset and "very emotional" during the August 10, 2014 incident and would have impeached Kim's testimony that the children had been traumatized by the assault; (4) the undisclosed

34

family-violence packet refuted Kim's claim that Hallman had threatened to kill them if he went to jail; and (5) the undisclosed family-violence packet impeached Kim, Rita, and Amy on issues going to the heart of the defensive theory.

In his supplemental brief, Hallman argues that the proper harm analysis is that of constitutional harm under Rule of Appellate Procedure 44.2(a), requiring reversal unless it can be determined beyond a reasonable doubt that the error did not contribute to his conviction.

### 2. The State's Argument

In its opening brief on remand, the State agrees that the evidence should have been disclosed but argues that Hallman has overstated the family-violence packet's evidentiary value, that a finding of harmless error is required, and that the trial court did not abuse its discretion by hearing and ruling on Hallman's motion for mistrial even though a different judge heard the guilt–innocence evidence. The State contends that the disclosed offense report provided the same impeachment material as the undisclosed family-violence packet; that the undisclosed family-violence packet did not impeach Detective Robles's testimony, which did not leave a false impression that the children had been emotional and did not impeach Kim's testimony regarding the children's demeanor or that she had reported concerns of sexual abuse; that Hallman misrepresented Kim's testimony that he had threatened to kill them if he went to jail; and that the information Hallman alleges that he would have used for impeachment is also contained in the offense report.

In its supplemental brief, the State argues that the proper harm analysis is that of nonconstitutional harm under Rule of Appellate Procedure 44.2(b), requiring the court to disregard the error if it did not affect Hallman's substantial rights. The State presents the denial-of-mistrial test under *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), as an alternative, because the actual complained-of error here is the trial court's denial of Hallman's motion for mistrial.

## C. Error

Evaluating whether a mistrial should have been granted is similar to performing a harm analysis in that it involves most, if not all, of the same considerations.[27] *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007). Mistrial is a remedy for

---

[27]We have already identified in *Sopko* that an Article 39.14 violation is reviewed under Rule 44.2(b), 637 S.W.3d at 256–57, which requires any such error to be disregarded as long as it does not affect the appellant's substantial rights, Tex. R. App. P. 44.2(b). Under Rule 44.2(b), an error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

"improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). It is required only in extreme circumstances in which the prejudice is incurable. *Id.* The factors to consider in a mistrial analysis include (1) the severity of the misconduct (i.e., the magnitude of the prejudicial effect); (2) the measures adopted to cure the misconduct (i.e., any instructions or options the trial court gave in mitigation); and (3) the certainty of conviction absent the misconduct (i.e., the strength of the evidence supporting the conviction). *Id.* (referencing *Mosley*, 983 S.W.2d at 259). In reviewing a trial court's ruling on a motion for mistrial, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699; *cf. Ambrose*, 487 S.W.3d at 594–95 (explaining that when a statute directs what treatment an appellate court must give to a particular type of error, a rule of appellate procedure cannot be employed to circumvent the statutory requirement).[28]

---

[28]As distinguished from both nonconstitutional error and discretionary rulings, the structural-error doctrine exists to ensure certain basic, constitutional guarantees that should define any criminal trial's framework. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017). "[T]he defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Id.* (citations and quotations omitted). A structural error defies analysis by harmless error standards. *Id.* at 1907–09; *see also United States v. Davila*, 569 U.S. 597, 611, 133 S. Ct. 2139, 2149 (2013) (explaining that structural errors "include denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt"); *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991); *Jordan v. State*, 256 S.W.3d 286, 290 (Tex. Crim. App. 2008). For example, the total

Under the circumstances presented by this classic he-said, she-said sexual-abuse case, the elected judge abused her discretion by denying Hallman's request for a mistrial. The State disclosed impeachment evidence for the first time during the punishment phase of trial—after Hallman had been found guilty of six out of seven sexual-abuse counts—in a case that turned entirely on witness credibility. At that stage of trial, a continuance to assess the evidence's use was too late and any subsequent cross-examination of Kim using that impeachment evidence would have been pointless.

Further, unlike the elected judges in *Wheeler* and in *Serrano*, nothing in the record before us reflects that the elected judge in this case took any steps to mitigate the harm from the belated disclosure or to familiarize herself with the guilt–innocence proceedings. *Cf. Wheeler*, 203 S.W.3d at 321–22; *Serrano*, 636 S.W.3d at 724 & n.4, 727. There is no indication in the record that she had been in contact with the visiting judge during the trial's guilt–innocence phase, and she did not review the guilt–innocence transcript; instead, she declined to do so when asked by defense counsel. The objective facts, viewed in the light most favorable to the trial judge's ruling, show that the elected judge did not appreciate the size of the shadow cast by the August 10,

---

deprivation of counsel at trial is a structural error. *See Gideon v. Wainwright*, 372 U.S. 335, 342–45, 83 S. Ct. 792, 795–97 (1963); *Davis v. State*, 484 S.W.3d 579, 586 (Tex. App.—Fort Worth 2016, no pet.); *see also Casas v. State*, 524 S.W.3d 921, 924 (Tex. App.—Fort Worth 2017, no pet.) ("[T]he lack of an impartial trial judge is a structural error that violates due process and is not subject to a harm analysis.").

2014 incident during the guilt–innocence proceedings. *Cf.* 75 Am. Jur 2d Trial § 154 (recommending at least adequate familiarity with a case that depends on credibility when a judge is substituted). The objective facts also show that the elected judge took but a single step to familiarize herself with the importance of that incident and the impeachment evidence: comparing the written statements to the disclosed offense report. Accordingly, the first two *Mosley* factors weigh heavily in favor of a mistrial.

Finally, although the State argues that Hallman's conviction was certain even if the impeachment evidence had been disclosed, a close review of the record displays the curious timing of the complainants' outcry statements and the parties' divorce proceedings, as well as inconsistencies throughout the testimony of the State's witnesses, of which—as noted above—the elected judge was unaware when she denied the defense's motion for mistrial.

## 1. Voir Dire

After a defense-requested jury shuffle, the magistrate judge told the venire panel that the jury would be picked to hear a continuous-sexual-abuse-of-a-child case. The magistrate judge covered the presumption of innocence, the burden of proof, and the privilege against self-incrimination. Among other things, the prosecutor explained Article 39.14, stating, "We've got to turn that over to the Defense. Okay. We show our hand, if you will. The Defense does not have to do the same thing." She also explained that there is rarely DNA and video evidence, so what is left is the child's

testimony. The defense talked to the venire panel about corroborating evidence: medical findings, injuries, photos, video, DNA, cell phone records, internet searches, eyewitnesses, sexually transmitted diseases, counseling records, and other sources of evidence.

During voir dire, potential jurors who were not selected expressed strongly held opinions on the presumption of innocence and the fact that Hallman had already been arrested, indicted, and brought to trial. They talked about how embarrassing it would be to discuss sexual history before the jury, how they would want to hear both sides of the story, how they might (or might not) give the benefit of the doubt to the child, and some (who were not selected for jury duty) talked about those they knew who had been sexually abused as children.

## 2. Opening Statements

The prosecutor told the jury that Rita and Amy would talk about how Hallman had sexually abused them, that Amy had outcried right before trial on Rita's allegations, that there would be no DNA or physical findings, and that the jury would have to weigh the girls' credibility. She stated, "After you hear from all of the evidence, all of the witnesses in the case, it comes down to the girls. And you're going to weigh whether or not you believe them."

The defense told the jury that the girls' stories had been inconsistent other than their consistent denials of abuse until their outcries and that Amy's choosing Hallman over Kim was "too much for [Kim]. This was a desperate woman," who, seventy-two

40

hours later, dropped the "abuse" bomb. And then when Rita decided she could not go through with testifying, "lo[] and behold[,] [Amy] comes to the rescue" with her own outcry. The defense told the jury that "[t]his was a superficial investigation," with no independent witnesses and "not one shred of forensic evidence" to corroborate the girls' accounts.

**3. The State's Case-in-Chief During Guilt–Innocence**

Rita was born in April 1998 and was twenty years old at trial. Amy was born in December 1999 and was eighteen years old at trial.

The jury's task was to determine whether, on or about December 23, 2011, Hallman had (1) intentionally or knowingly caused his sexual organ to contact Amy's sexual organ when she was younger than fourteen years old (i.e., prior to December 2013); (2) intentionally or knowingly caused his mouth to contact Amy's sexual organ when she was younger than fourteen years old; (3) intentionally, with the intent to arouse or gratify the sexual desire of any person, caused Amy, a child younger than seventeen years old (i.e., prior to December 2016), to engage in sexual contact by causing her to touch any part of his genitals; (4) intentionally, with the intent to arouse or gratify the sexual desire of any person, engaged in sexual contact by touching any part of the genitals of Amy, a child younger than seventeen years old; (5) intentionally, with the intent to arouse or gratify the sexual desire of any person, engaged in sexual contact by touching the breast of Amy, a child younger than seventeen years old; and

41

(6) intentionally or knowingly caused Amy's sexual organ to contact his sexual organ when Amy was younger than seventeen years old.[29]

According to both women, Hallman began sexually abusing or grooming them for sexual abuse when they were twelve years old, in 2010 for Rita and 2011 for Amy, respectively.

The record reflects that the family had lived in several different places between 2006 and 2014: a house on Conroy Street, an apartment on Cherry Hill, a house on Bandy Street, and finally—without Hallman—an apartment on Woodfield Road, as follows:

- 2006–February 2008: Conroy Street house.

- February 2008–September/October 2008: Cherry Hill Apartment.[30]

- September/October 2008–September 2010: Conroy Street house. According to Amy, Hallman had come back into the family's life in 2010, and according to

---

[29]The offense for which the jury acquitted Hallman was continuous sexual abuse of Rita and Amy. The indictment alleged as to that offense that Hallman had, on or about December 23, 2011, through December 22, 2013, intentionally or knowingly, during a period of time that was 30 days or more in duration, committed two or more acts of sexual abuse, namely: aggravated sexual assault of a child under the age of fourteen by causing his sexual organ to contact Amy's sexual organ and/or by causing his mouth to contact Amy's sexual organ, and/or indecency with a child by causing Amy to touch any part of his genitals and/or by touching any part of Amy's genitals, and/or indecency with a child by causing Rita to touch any part of his genitals, and at the time of the commission of each of these acts of sexual abuse, Hallman was seventeen years of age or older and Amy and Rita were younger than fourteen years of age.

[30]Kim testified that she had moved from the Conroy house to the Cherry Hill Apartment because of domestic abuse.

Rita, Hallman's first act of sexual abuse of her had been in the Conroy house in 2010.[31]

- September 2010–October 2014: Bandy Street.[32] According to Amy, Hallman and Kim had separated between 2010 and 2012, Hallman and Kim had separated again briefly in 2013, and then Hallman was arrested and was away from the family from September 2013 to January or February 2014.[33]

- October 2014–September 2018: Woodfield Road Apartment. According to Kim, Hallman never lived in the Woodfield apartment.

Based on this timeline, Hallman lived in the same household as Amy and Rita in part of 2010, in 2012, in part of 2013, and from February 2014 until the August 10, 2014 incident. From March 6, 2016 to April 7, 2016, Amy lived with Hallman in his

---

[31]Rita said that the first time an incident of sexual abuse occurred, Hallman had asked her to put Vaseline on his feet and penis and that she did so. She told her older half-brother Martin about the incident the next day. Martin testified that before Rita told him, he had been completely unaware of any signs of perversion in Hallman. Martin told Kim around a week later, and she kicked Hallman out. Kim said that she had confronted Hallman about what Martin had told her and that Hallman first denied the incident and then claimed that he had thought it was Kim, and not twelve-year-old Rita, when he talked about rubbing lotion on his penis. Kim said that at the time, she "honestly thought that—you know, because he did like to get drunk, that, you know, he was in a stupor, and he honestly did think that that was me lying on the couch [as] opposed to her lying on the couch."

[32]Kim testified that she had moved from the Conroy house to the Bandy house because of domestic abuse.

[33]During the punishment phase, the trial court admitted into evidence Hallman's criminal history, which showed that he had pleaded to and was found guilty of Class B misdemeanor fleeing from a police officer on October 10, 2013, and sentenced to fifty days. Hallman's criminal history during punishment also showed that he had pleaded guilty to Class A misdemeanor assault–family violence arising from the August 10, 2014 incident and was sentenced to 95 days.

vehicle and in various motels. In addition to the evidence set out above, the jury heard the following.

### a. Rita's Testimony

Rita said that the whole family participated heavily in church and that, at one point, Kim and Hallman had helped start a vacation bible school. Kim often worked late and then took medication that made her sleep, so Hallman took Rita to her high school marching band practice and to other school activities. Rita had band practice in the afternoon during her freshman and sophomore years of high school and did not get home until five p.m. or later. Amy and the younger siblings would be at home while Rita was at band practice and Kim was at work.

Rita said that Hallman was a preacher and told her "that back in Bible times, that fathers would have sex with their daughters." Rita also claimed that Hallman bought clothes for her and Amy and supplied marijuana to them, and she stated, "[W]hen me or my sister wanted something from him, he would always . . . tell us to do things like to him, or we had to let him see one of our private parts if we wanted something like clothes or shoes or anything." But Rita also said that she had never witnessed any sexual abuse of Amy and that she did not find out until later that Amy had been sexually abused by Hallman or that Amy had seen him abuse her.

Rita testified that Hallman had asked her to have sexual intercourse with him on various occasions but that she had declined. On one occasion when she refused

him, he slapped her hard on her back, leaving a handprint and making her cry,[34] and then he began molesting her at night, sticking his hands into her pants and touching her under her clothes. Rita testified that the touching happened "[e]very night," but she agreed on cross-examination that she had told the forensic interviewer that it was "probably like maybe three times out of the week." And when she was fifteen or sixteen years old, she spent the night at her best friend's house "like three weekends out of a month, maybe," during the same time period that she was being abused.[35]

Rita said that if she wanted to spend the night at her friend's house, Hallman would tell her that she had to show him either a breast or her vagina before she went and that this happened a lot when she was between fourteen and sixteen years old, i.e., between 2012 and 2014. Rita testified she "never would" show him either body part.

Rita said that Hallman had never threatened her and had never said what would happen if she told someone about the abuse but that she "thought he would probably try to kill us, because we -- it was like we had no control in the house at all." She

---

[34]Rita also claimed Hallman had physically and emotionally abused Kim and Ron but not her or Amy. Martin, on the other hand, testified that he had seen Hallman verbally abuse Rita and Amy but that he had never seen any signs of physical abuse or neglect.

[35]According to Amy, when they lived in the Bandy house, Rita "would actually stay gone from home. Like she would usually go with her friends and stuff like -- spend the night with her friends and stuff" all the time.

stated that Hallman had tried to turn her and Amy against Kim, and she denied that Kim had coached her on her testimony.

Rita stated that she was sixteen years old the last time Hallman tried to have sexual intercourse with her, which would have been in 2014. However, Rita also testified that they had been living at Bandy when Hallman came into her room, undid his pants, told her to be quiet, got on top of her, and "tried to insert hisself [sic] inside of [her]." She said that it happened once but agreed on cross-examination that she had told the police in a written statement that he had tried to do it again the next night.[36] She described the feeling of penetration as "[u]ncomfortable and scary."

Rita initially testified that she did not recall the August 10, 2014 incident but then stated that she had called the police because Kim and Hallman had been arguing and because Hallman had been hitting Ron. She did not recall whether the argument had involved Amy.

Rita denied that she had been sexually abused when she spoke with CPS caseworkers in 2014. She initially did not recall that she had gone to counseling after the August 10, 2014 incident but then agreed that she had gone to counseling in 2015 and that Hallman had taken her and Amy to some of their counseling appointments. Rita did not tell the counselor about any sexual abuse and did not recall what they had talked about during their sessions or why she had been seeing the

---

[36]Kim testified that Hallman had never lived with the family at Woodfield.

counselor. Rita explained why she told Amy nothing about what was happening with her until a month before the trial, stating, "I felt like it was like embarrassing a little. So I really didn't want anybody to know. It was just something I wanted to keep to myself." She said she did not make her outcry until she thought something was happening to Amy because she did not want to break up the family and did not want to be the reason Hallman was removed from their home "or the reason that [Ron] and [Kelly] didn't have a dad."

### b. Amy's Testimony

Amy testified that she did not remember every detail of the sexual abuse, stating, "I just know that it happened to me, and I remember some details about the event, you know, good enough to be able to speak on it." Amy said that Hallman had sexually abused her from 2012 to 2016 on a "day-to-day basis."

Amy stated that Kim and Hallman's relationship had been abusive and that sometimes their altercations led to the police being called. They would throw things at each other, and she had seen Hallman abuse Kim once or twice. Hallman would say bad things to and about Kim, including that her seizures were fake.[37] Amy said that at the time, she did not understand why Hallman wanted to keep her and Rita from Kim. When Rita called the police on August 10, 2014, Kim and Hallman had been arguing in the front yard, and when Hallman pushed Kim, Ron ran up and bit

---

[37]Kim had a variety of medical conditions, which we set out in more detail below.

47

Hallman. Amy agreed that the argument had begun because she had wanted to go with Hallman. She denied any sexual abuse to the CPS caseworker who interviewed her after the August 10, 2014 incident. However, she testified as follows about the officers who had arrested Hallman that day:

> Q. The officers that came out and did the arrest in 2014, were they female or male officers?
>
> A. Male.
>
> Q. And did they ask you about if he had ever been abusive to you or sexually abusive to you, rather?
>
> A. Yes, ma'am.
>
> Q. What did you tell them?
>
> A. No.
>
> Q. Had you ever met those officers before?
>
> A. No, ma'am.

Amy said that Hallman had come back into the family's life in 2010, but then he and Kim separated until 2012, when they lived in the Bandy house. Amy said that when the family lived in the Bandy house, she and Rita shared a room, and Kim had worked a lot, had been very sick, and had had seizures on a consistent basis. Kim had supported the family while Hallman earned money by salvaging scrap metal. Amy said that Hallman would take her and Rita to go salvaging with him and would take them to restaurants, to flea markets, and to the lake to skip rocks. When Amy was eleven or

twelve, she was homeschooled. She had been bullied at school, and Hallman had encouraged and supported her.

Amy said that Hallman and Kim separated again in 2013 for a short period, and then he was arrested and went away from September 2013 to January or February 2014. Hallman and Kim separated for the last time in August 2014. Amy agreed that the whole family had lived together in the Bandy house for only a year and a half. Hallman had visited the children at the Woodfield apartment between 2015 and 2016.

Amy testified that when Hallman lived with them at the Bandy house and he and Kim stopped getting along, Hallman slept in the living room while Kim stayed in her bedroom most of the time, with her door closed. Amy said that Hallman would make sure that Kim's door was shut "[s]o that she couldn't get up. Well, if she were to get up, he would be able to hear her opening the door, or just to -- because our room was right across from hers, so just to make sure that she doesn't see him going in our room." Amy said that he checked Kim's door often and came into her and Rita's room at night.

Amy said that when Rita had been a freshman in high school, she had band practice from 4 p.m. to 7 p.m. or 7:30 p.m. If the band played at a game, Rita would not get home until 1 a.m. Amy was at home alone with Hallman while Rita was at band practice, and Kim did not get home from work until 9 or 10 p.m.

When asked about the first time she remembered Hallman's doing something that made her feel uncomfortable, Amy replied that when she was in the seventh or

eighth grade and Rita was in the ninth or tenth grade (i.e., between 2011 and 2013), they had played a game with Hallman that made her uncomfortable:

> A. Well, it started off like we were -- we used to play this game. It was called butt plugs.
>
> . . . .
>
> . . . And what he would do is -- it would start by us like -- basically he would start by, you know, trying to touch us, and we would laugh, you know. And it would begin as that, and then we'll start wrestling. It'll be like him trying to get us. But once he did get us, he'll try to pull our pants down and put his hand between our butt.
>
> Q. And when you say "our," are you talking about you and [Rita], or you and the other kids?
>
> A. Me and [Rita].

Amy said that Kim had been at work at a day care when this went on and that Ron and Kelly had been at the day care with Kim.

Amy also recounted that Hallman had asked her if she had started growing hair on her private area when they were in the computer room of the Bandy house. On another occasion in the computer room, while Rita was at band practice and Kim was at work, Hallman pulled down then-twelve-year-old Amy's navy school uniform pants and put his mouth on her vagina. Ron was not home from school yet, and Kelly was at the day care with Kim. Amy said that she pushed Hallman's head away and told him to stop. Amy said that he then "got up and pulled his pants down and tried to put his penis into [her] vagina." When he did, she yelled because it hurt. He told her to be

still, so she tried to be still, and he forced his penis into her vagina. Hallman ejaculated into his hand on that occasion, then pulled up his pants, and went into the bathroom.

Amy testified that she had seen Hallman molest Rita, stating,

I remember nights where I would be laying in my bed [a]sleep, and then I would see [Hallman] creeping into our room. And then sometimes I would pretend to be [a]sleep, but when -- if I just so happened to wake up, I would look over and I would see him in [Rita's] bed. He had his hands up under the cover, and I would just see his hands moving around, you know, at the time. And I would [look] at him, and he would just look at me and go "shhh," like that. And I wouldn't – I didn't even say -- like I didn't scream or anything. I would just turn back over.

Amy said that she had told Rita what she had seen "about a month" before trial and that she had seen Hallman over with Rita in their room "[a]lmost every night." Amy said that she talked with Rita about having seen Hallman molest her "[o]nly . . . after the fact of everything had went on" because though they were close, "there was still like distance between" them.

Amy testified that Hallman never tried anything with her in the girls' bedroom.[38] Instead, he would whisper her name to get her out of bed, sometimes coming into the girls' bedroom and tapping or shaking her to get her up, and he would then take her into the living room or computer room. When he took her into the computer room, he "would have sex with [her]." He would touch her breasts, put his mouth on her breasts, and put his mouth on her vagina. He made her touch his

---

[38]During cross-examination, Amy said that she did not recall telling the sexual assault nurse examiner that Hallman had sexually abused her in her bedroom.

penis "[i]n the moments of when he was trying to get [her] to have sex with him." She said that sometimes he would look at inappropriate things on his phone, and if she happened to be around, he would try to get her to touch his penis.

Amy said that when Hallman took her to the living room, he would get her out of her clothes and try to have sex with her or put his mouth on her vagina and then try to have sex with her. Hallman slept in a T-shirt and boxers. Amy said that as to the living room, "I would be on the couch, or he used to sleep in the couch chair. And he would push like the futon up to it. So I would probably [be] laying on that." Amy said that Hallman had also shown her pornography in the living room.

Amy stated that one time in the computer room, when Hallman was standing by the door, he told her to get on her knees, and "he told [her] to put his penis . . . into [her] mouth and to suck it." Amy said that this had happened more than once. He told her that if she told anyone, he would go to jail. Amy testified that she felt like Hallman had treated her as both his daughter and a wife. On cross-examination, Amy testified that she would see Hallman molesting Rita and that, on some occasions, he would come over to her next.

Amy recalled CPS workers asking about sexual abuse but said that she did not tell anyone because

> [h]onestly, because the situation is -- not only is it embarrassing to even think that something like that could happen to you, but I just -- how can I feel like I can trust somebody? Think even comfortable enough to -- I haven't even told my mother or my sister anything like that -- like this situation. You know, so how can me as a little girl feel comfortable

52

enough to tell some -- an outsider who -- when you think of CPS, kids think that someone is going to take me away from my house, and I'm going to, you know, live somewhere else. Or they're going to take me from my family. So I didn't even think to tell her something like that, especially with them constantly being in our lives as much as they were. I felt like I could get to -- as well as lose my parents, I could lose my brothers and sisters as well.

After the August 10, 2014 incident, Amy said she went to counseling in 2015 to deal with Kim and Hallman's separation issues. Hallman took her to counseling once or twice; Kim took her the rest of the time. Amy never mentioned sexual abuse to the counselor.

The day that then-sixteen-year-old Amy left home with Hallman, she and Rita had argued about some clothes and about cleaning up their room. She left Hallman several messages before he responded, and by the time he came and got her, it was late at night. Kim had been livid when Hallman came to pick her up, and she did not want Amy to go with him. Amy said that Kim said nothing about being afraid that he was going to sexually abuse her.

Hallman took Amy to church to get financial assistance, applied for food stamps and Medicaid, and took her to food banks. She went with him to his job site as a remodeler and to Tarrant County College, where he was taking classes, and she stayed in the computer lab while he was in class. They spoke with Yolanda Sifuentes, a Tarrant County College coordinator, to try to obtain assistance. Amy said that her phone had been turned off and that, in light of how she had left Kim's home, she did not feel like she could speak with Kim.

Amy said that she stayed with Hallman for two months and that when they stayed at a hotel, he would try to have sex with her because they slept in the same bed.[39] Amy stated,

> I remember one morning . . . I woke up, he was on top of me and he was trying to stick his penis into my vagina. And I was like, no, you know, leave me alone. And he was like why are you -- why are you moving? You know what I'm trying to do. And as though it's like something normal. And I would just -- like, I didn't want him to do that to me, and he still did it anyway.

Afterwards, they went to church. Hallman talked about the Bible with her and told her "[t]hat God said it's nothing wrong with what he's doing, didn't say anything in the Bible that says he can't -- that it's something wrong with him doing what he's doing, having sex with us." Amy said that she had believed him at the time but did not any longer. Amy said that he had tried to make the sexual abuse seem normal.

Amy was sitting in Hallman's vehicle in the Tarrant County College parking lot on April 7, 2016, when a police officer came to the vehicle, asked if she was Amy, and told her that Hallman had said that she needed to go with him. The officer asked if she and Hallman had been living in the vehicle, and although they had been, she told him no. At the time, she thought Hallman had been arrested for traffic tickets. The

---

[39]The record reflects that it was approximately one month, from March 6, 2016, to April 7, 2016. Amy identified a photo of the Motel 6 where she and Hallman had stayed in March 2016.

police took Amy to Alliance for Children,[40] where people asked her if Hallman had ever done anything to her. She told them "no" but testified that she "really should have told [them] the truth." Amy instead denied that anyone had sexually assaulted her, told her interviewers that Kim was irrational, and described Kim has having hurt her mentally and emotionally. She said that before she left home with Hallman, Kim had threatened to cut off her phone service if she tried to communicate with Hallman and that Kim had said that if Amy wanted to talk with him so badly, she could move in with him.

Amy said that she did not know why Hallman was in jail until, weeks after his arrest, she looked it up on the internet. Amy stated that Rita's strength and something her pastor at church had said ultimately encouraged Amy to make her outcry. Amy did not remember what the pastor had said. Amy stated that it was a coincidence that she had made her outcry the day before Hallman's trial on Rita's sexual-abuse allegations was set to begin. When she made her outcry to Kim, they were on the way home from church when she started crying. Amy did not tell Kim what was wrong until they got home because Kelly and Ron were in the back seat. She changed out of

---

[40]Alliance for Children is a nonprofit organization that employs therapists, case managers, social workers, forensic interviewers, and other service providers, and coordinates with police and other agencies. It is located near Cook Children's Medical Center, where exams by sexual assault nurse examiners (SANE) are performed. Alliance for Children's role as a child advocacy model is to help facilitate communication between different agencies and to "provide helping and healing services to the victims and their protective caregivers."

her church clothes and then went to her mother's room, closed the door, and "poured [her] feelings out to [Kim]." Amy said that she did not recall a phone call from Rita to Kim that day while they were in the car or Kim's becoming upset because Rita was refusing to testify the next day. Amy said that she had initiated the conversation with Kim, who then called the prosecutor and notified the police.

Amy agreed that Kim had told her children that she had been abused by her stepfather. Amy said that she could trust Kim "[t]o a certain extent" and that she knew that if she went to her and told her about Hallman's abuse, Kim would believe her. Amy said that she had not really connected with Kim when they lived in the Bandy house.

Amy had retained Hallman's phone when he was arrested, and Kim obtained his truck, which contained all of Amy's and Hallman's belongings. Amy said that Hallman would watch pornography on his phone. Because Amy had possession of his phone when he was arrested, she agreed that the police could have searched the phone to verify this. Amy agreed that she had denied during her forensic interview that anyone had shown her pornography, and the following colloquy occurred during her cross-examination:

> Q. Okay. So you weren't truthful?
>
> A. No, ma'am, I wasn't. Because at the time, who is going to be -- for one, I never talked about sexual abuse with anybody. So at the time, who was going to be comfortable enough to just come out and say everything that just has happened with them or just even remembered at the time. I was telling what I remembered and what I knew.

56

Q. So you're going to situationally decide when you're going to tell the truth?

A. No. Don't -- please don't make it seem -- don't put it as thought I'm lying, because, no --

Q. Well, when someone asks you to tell the truth, and you promise to tell the truth, and you don't --

A. It's not like I wasn't telling the truth. Because I was telling the truth at the time. It's just that it's just some things that you just don't feel all the way comfortable talking about, especially in a situation where you're talking about sexual abuse . . . .

### c. Kim's Testimony

Kim testified that Hallman had brainwashed Rita and Amy against her by telling them they did not have to respect her and that he had treated Kelly and Ron differently from Rita and Amy, who he took on shopping expeditions where he bought inappropriate items, such as lingerie,[41] for them. When Kim complained, he would tell her "[t]hat those are his daughters and he can do what he want[s]." Kim claimed that Hallman had treated Amy more like a wife, keeping her close to him all the time and having her walk out in her robe to get in his truck with him,[42] and

---

[41]During cross-examination, when asked how the shopping trips were conducted, Kim said that she had been told that Hallman had helped Rita and Amy pick out lingerie at Victoria's Secret, not that he would just wait for them in the car or inside the mall, but she agreed that she had not been there.

[42]When asked whether she went outside to investigate when Hallman and Amy were in the truck at 1 or 2 a.m., Kim said that she went on "a few occasions" to see what was going on and that they would "be just sitting in the car," and she would make Amy go back inside. She added, "But with his rage and fits and the abuse that I would have to suffer from whatever . . . instruction I would give the kids or directions, you know, I would tell them to come in, but he would tell them they didn't

"when . . . he was residing with his sister, he would sleep in the room with [Amy]." In 2014, when he came home late from work, he "would make it a point to sit at . . . my daughters' room door." He would tell her that "he was spending time with his kids," and he kept the girls up late watching movies. She felt like he pitted the children against her and against each other, and she said that she had asked Hallman several times "was anything going on with him" with the girls. Kim said that Hallman had told her that she was "crazy and, no, that it was not going on."

Kim had worked in day care for twenty-seven years. She agreed that by virtue of her daycare work, she had had exposure to training and discussions about watching out for potential child sexual abuse but said that this had not included what grooming looked like. Kim said that she had only learned how to recognize such signs of abuse since receiving training after her daughters' outcries. Kim said that Rita had been around ten years old and that Amy had been around eight years old when they had their first conversation with Kim about "stranger danger, unsafe places to be touched, sexual abuse, the awareness of sexual abuse."

Kim suffered from a variety of ailments: lupus (an autoimmune disorder causing chronic fatigue), epileptic seizures, bipolar disorder (manic depressive), high

---

have to." She agreed that if she had thought there was something sexual going on in the truck between Hallman and Amy, that would have warranted calling the police, and she agreed that she had not called the police.

blood pressure, heart problems, and lymphatic and thyroid problems.[43] She testified that she took twenty-six different medicines to treat her conditions and that her medications and chronic fatigue made her tired. Kim stated, "Once I'm [a]sleep, I'm [a]sleep. I don't hear anything or anyone."

Kim stated that when Hallman lived with her and the family in the Bandy house, he slept in the living room, while Kim slept in an area that she had made out of the garage. Kim said,

> During the time that the molestation or the abuse took place, I did say earlier in my testimony that I was in the . . . room that I called a study that I made out of the garage, and that's where I was sleeping. And that is off from the house where, no, you cannot hear what is going on inside the house because it is a[n] outside room that's the garage.

Kim said that she had tried to leave Hallman several times but that she had been unable to because she had needed someone to care for the younger children while she was "trying to work and be productive as a mother, the . . . abuse,[44] the overpowerment, the rage, the nonhelp from authorities, being in fear of what would happen if the authorities were called and [Hallman] was left behind." Kim claimed that Hallman had threatened to kill them if they sent him to jail, but she also said that he had moved into the Cherry Hill apartment when she became ill and needed help with the children.

---

[43]Amy added that Kim suffered from rheumatoid arthritis and digestive problems.

[44]Kim testified that Hallman had abused her and the children.

Kim testified that in March 2016, Amy had become upset because Kim would not let Hallman, who was homeless at the time, live with them in the Woodfield apartment. After their argument, Amy called Hallman and asked him to come get her. Hallman came and picked her up, and Kim called the police and CPS after Amy left with him. Rita made her sexual-abuse outcry three days later. Amy lived with Hallman for a month and did not attend school during that time.

Two weeks after Amy was returned to her, Kim retrieved Hallman's vehicle from the Tarrant County College parking lot "because it had [Amy's] belongings in it," including all of Amy's clothing. It also had Hallman's phone and some of his belongings. Kim said that she did not contact the police and tell them that she had Hallman's things "because there was no reason for [her] to. [They] were married at the time and that was community property." Kim drove Hallman's vehicle for two weeks and then sold it to CarMax, leaving all of his belongings in the vehicle.

Kim testified that Hallman did not live in the same house as Rita and Amy from 2014 to 2016, so she estimated that the time period of abuse would have been 2010 to 2014. The prosecutor asked her, "Did you ever lie and tell them to lie about what they went through with [Hallman]?" Kim replied, "I would never tell them to lie on [Hallman]. I would never lie on something that serious." Kim stated that she still loved him.

Kim filed for divorce from Hallman in May 2016 and received assistance from legal aid. She acknowledged that her divorce petition specifically referenced domestic

abuse, not sexual abuse, but she asserted that "I did make mention that there was sexual abuse. I believe I did. Whether they put it in there or not, I know that I made it known. That's why I did not . . . want him to have right[s] to the younger children." The divorce petition was not offered into evidence.

In 2017, right before the trial on Rita's sexual abuse allegations, Amy outcried. Kim said that Rita had been refusing to testify because she was afraid. After Amy outcried, Kim called the prosecutor. Kim said that "[Amy] has always been the protective little sister over [Rita] because [Rita] was always whiny," but as they've grown older, Rita became protective after "seeing the abuse that [Kim] endured]" and had "really started to step up and be very protective over [Kim] and the younger ones."

### d. SANE Nurse's Testimony

Theresa Fugate, the SANE nurse who examined Rita and Amy, testified that an acute sexual assault is one that happens within 120 hours of the exam, depending on the type of contact. After 120 hours have passed, DNA evidence is not available, but the child may still need medical treatment for sexually-transmitted diseases. On March 23, 2016, Kim brought Rita to the appointment, and Fugate examined Rita, who was seventeen years old at the time, by herself.

Rita told Fugate that she thought the abuse had started when she was twelve years old, which would have been in 2010, but that Hallman had been "in and out of [their] house a lot." Fugate said that Rita told her: "When I was like 12 years old, he

61

was laying on the couch[,] and he called me in there and asked me to rub Vaseline on his private parts. After that, I told my big brother [Martin], and he told my mom and she kicked him out."

Rita also told Fugate that Hallman had moved back in when she was thirteen years old (which would have been in 2011) and "started coming in [her] room at night and touching [her] privates," putting "his fingers inside [her]." Rita told Fugate that she would pretend to be asleep because she was scared and did not know what to do. She also told Fugate that when she was fifteen years old (which would have been in 2013), "he came in [her] room, did the same thing, but he took his clothes off and got on top of [her] and put his privates in [her] privates. And [she] tried to kick him off, but [she] couldn't." Rita said that no one else saw it happen because Amy was spending the night with a friend and Kim was at work. He tried again the next night because Kim was at work and Amy was still at the friend's house, but Rita fought him off. Rita told her that Hallman "got mad and then hit [her] in the back and left a bruise" and that she thought the last time anything happened was during the summer when she was fifteen years old. Rita identified Hallman as her abuser and said that the assaults mostly happened in her room at night. Rita identified the following acts of sexual abuse: penis-to-vagina contact, finger-to-vagina contact, hand-to-penis contact, and "general fondling."

Fugate performed Amy's SANE exam on February 17, 2017, when Amy was seventeen years old. Kim accompanied Amy and stayed with her during the exam but

not the interview. During the interview, Amy told Fugate that the sexual abuse had started when she was twelve years old, when Hallman would put his penis in her vagina and put his mouth on her genitals. Amy told Fugate,

> He made it seem like it was normal to do that. He wouldn't hit us, and he was like verbally abusive and mean. He would do stuff to me, you know, put his privates in my privates like every other night. He would come in at night when everybody was asleep, but it wasn't always at night. Just when we were alone. He did it in the living room and in the computer room.

Amy also told Fugate that it happened in her bedroom and that when she had lived with Hallman for around three weeks after she and Kim fought, he "did stuff to [her] then. He would take [her] to hotels, and he did it, put his privates in [hers]." Amy identified the following acts of sexual abuse: penis-to-vagina contact, finger-to-vagina contact, mouth-to-vagina contact, and hand-to-penis contact. She told Fugate that ejaculation happened in her vagina and in her hand. Amy said "yes" when asked about fondling, licking, and kissing as to the genital area. Amy also said that Hallman had provided liquor, beer, and marijuana.

Kim told Fugate that she had recently noticed Amy's "increased moodiness, some depression and decreased sleep," but Fugate said that both Rita and Amy had appeared healthy, alert, cooperative, and talkative and that they had no sexually transmitted diseases.

### e. Forensic Interviewer's Testimony

Samantha Torrance, who conducted Rita's and Amy's forensic interviews at Alliance for Children, testified that she had asked nonleading, nonsuggestive questions because the forensic interview is a factfinding interview to gather accurate information.[45] She described specific terminology such as "grooming," "sensory and peripheral details," and "delayed outcry."

Torrance stated that "grooming" is a term used to describe how a perpetrator gains access and opportunity to a sexual-abuse victim by developing a relationship so that when the perpetrator acts, the victim is conflicted about disclosing abuse. For example, a perpetrator might tell a child that if the child tells, he will get in trouble, that someone will get hurt, or that something bad will happen. Perpetrators also groom the environment to enable one-on-one access to the child and try to make the abuse seem normal. And perpetrators may use gifts: "I have seen perpetrators who buy things like lingerie, bras, sex toys, things like that for their victims." Some perpetrators use religion to justify the abuse and to prevent the child from feeling like she can talk about it.

---

[45]Fort Worth Police Sergeant Jonathan McKee, whose testimony we later discuss, explained the difference between a forensic interview—open-ended questions encouraging free-flow dialogue—and a CPS screening interview, which "will have direct questioning in them" about wide-ranging topics, including how children are fed and punished.

Torrance explained that "sensory details" meant details acquired through the five senses: sight, sound, touch, taste, and smell. She elaborated, stating that "[a] younger child who should not have had any kind of experience with sexual contact, if they can describe a sexual act with really clear peripheral and sensory details that they shouldn't know about, then that would definitely stand out a lot more than if an older child is talking about it."

Regarding "delayed outcries," Torrance said that it was common for sexual-abuse victims to delay disclosure, often because the abuser was someone they knew and trusted. The abuse memories of a child who has experienced chronic sexual abuse often "start to blur together," so minor discrepancies are "not too concerning" because sometimes they happen because different questions are asked. Torrance said that what was important was that the major details of the recollection stay consistent.

Torrance said that Alliance for Children provides counseling services for a victim's protective caregiver and offers community-education programs for parents and counselors about child sexual abuse dynamics, but she did not know if Kim had taken advantage of these educational programs. She acknowledged that during the year between Amy's and Kim's interviews, a parent who was inclined to coach a child could learn about grooming and delayed outcries and that this could make it more difficult for Torrance to recognize signs of coaching.

Torrance conducted Rita's interview on March 14, 2016. Kim waited in the lobby while Rita was interviewed. Torrance said that Rita had disclosed sexual abuse

65

as well as "sensory and peripheral details" about the abuse and stated that she had no concerns that Rita had been coached. However, she did not testify about what sensory and peripheral details Rita had disclosed.

Torrance interviewed Amy on February 13, 2017. As she had with Rita, Kim waited in the lobby while Amy was interviewed. Torrance stated that, like Rita, Amy had disclosed sexual abuse as well as "sensory and peripheral details" about the abuse. However, as with her summary of Rita's interview, Torrance did not testify about what sensory and peripheral details Amy had disclosed. Amy did not mention the "butt plug" game or performing oral sex during her forensic interview. Torrance stated that she had no concerns that Amy had been coached.

### f. Detective McKee's Testimony

Fort Worth Police Sergeant McKee was the detective assigned to Hallman's case on March 10, 2016, the day after Rita's outcry. He set up a forensic interview for her at Alliance for Children on March 14, and an exam with the SANE nurse on March 23. He was unable to watch the forensic interview from the adjoining room because he was watching a forensic interview in someone else's case. Instead, Detective Kesler watched Rita's forensic interview and interviewed Kim after Rita's forensic interview. CPS was notified about Rita's outcry and screened Ron and Kelly but could not screen Amy because they did not know where she was, other than that she was with Hallman.

Detective McKee explained the difference between "acute" (immediate) and "delayed" outcries, which did not usually involve DNA evidence because so much time had passed. Detective McKee stated, "[C]hildren decide to disclose their abuse when they're ready to talk about it. And a lot of times that's not right away." He said that he had "often" seen cases in which a child did not outcry during a CPS screening but later outcried. He did not talk with Rita and Amy's school principal or their teachers; retrieve their school attendance records, grades, or counseling records; or interview any of their friends during his sexual-abuse investigations.

Detective McKee knew nothing about the house on Bandy Street, where some of the alleged abuse had taken place, and he had not sought a lease to determine when the family lived there. When asked why he had not sought to locate physical evidence, he stated, "It had been many, many years. They had moved multiple times. I did not see that as being feasible to collect evidence." He had not sought a search warrant for Hallman's phone or computer, stating, "I had no reason to believe that there was evidence of a crime" on those items. During cross-examination, he said that he had not known there were over 1,000 pages of CPS records in connection with the family but said that those records would have been inaccessible to him.

After Detective McKee obtained an arrest warrant for Hallman, Hallman was arrested in class at Tarrant County College, and Amy was found in his vehicle in the TCC parking lot. He agreed that there could have been evidence useful to the case in

Hallman's vehicle but said there was no record that the police had seized the vehicle.[46]

After Hallman's arrest, Amy was taken to Alliance for Children and released into CPS custody. When CPS screened her, she denied having been sexually abused, and CPS released her to Kim.

Detective McKee was notified on February 12, 2017, about Amy's outcry—the day before the trial on Rita's allegations was supposed to begin—and he immediately scheduled her for a forensic interview the next day. This time, Detective McKee observed the interview, and he obtained Kim's statement.

Detective McKee agreed that Amy had talked about having been sexually abused in a motel but that she did not recall which one. He did nothing to discover which motel and did not interview anyone outside of the family when investigating Amy's case. He did not review Kim and Hallman's divorce records.

### g. Former CPS Investigator's Testimony

Derek O'Neill, a former CPS investigator, testified that he had investigated Rita's sexual abuse outcry in 2016 but none of the family's prior CPS history. He did not screen Rita because she had been referred for a forensic interview. He had interviewed Kim, Ron, Kelly, Kim's best friend, and the assistant principal at the

---

[46]During a brief recess, Detective McKee acquired information requested by defense counsel about Hallman's vehicle that showed that by the time it came into the police's possession after a traffic accident in June 2017, the vehicle no longer belonged to Hallman, which corroborated Kim's testimony that she had sold the vehicle to CarMax.

younger children's elementary school, and based on his interviews, he had no concerns. Amy had not been available for him to interview. He had worked with Dolores Urzua, another CPS investigator, but he did not recall asking Urzua to screen Amy for him.

### h.  Martin's Testimony

Martin, Rita and Amy's older half-brother, was five years old when Kim and Hallman's relationship began, and he had looked up to Hallman as his father. Before Martin's 2010 arrest on felony drug charges, Rita told him about Hallman's wanting her to rub Vaseline on his feet when Martin got home from football practice. Martin did not otherwise directly confirm Rita's account—rather, he obliquely testified that Rita had also disclosed to him something else Hallman made her do and that he had not been sure how to tell Kim what Rita told him. He stated that when he told Kim what Rita had told him, Kim had been "calm but aware," and that to his knowledge, Kim had not called the police. Martin also testified that Hallman could not keep a job and that he had been attending school at Tarrant County College while Martin was in prison. Martin went to prison in 2011 after he violated his probation.

### 4. Defense Case-in-Chief during Guilt–Innocence

### a.  CPS Investigator's Testimony

Delores Urzua testified that she had performed a fifteen-to-twenty-minute screening interview on Amy on April 7, 2016, as a favor to O'Neill. Only six minutes of the interview were recorded, and those six minutes did not contain any report of

sexual abuse. Notwithstanding the lack of notes or the interview recording, Urzua testified that Amy did not make a sexual-abuse outcry because, if she had, CPS would have identified the perpetrator, assessed the situation, and involved a forensic interviewer and the police. According to Urzua, in the six-minute recording, Amy's primary complaint was about Kim, not Hallman.

### b. Kim's Testimony

Kim recalled talking with Rita on the phone on the way home from church on the day that Amy outcried. Amy had been in the car while Rita and Kim discussed Rita's being afraid of testifying. Contrary to Amy's testimony that she did not know why Hallman was in jail until weeks after his arrest, Kim said that Amy had known about Rita's sexual-abuse outcry because Hallman, Kim, and Rita had gone back and forth over the phone and by text message about the outcry, and those texts between Kim and Hallman had been on Amy's phone. Kim said that when Amy was picked up by CPS in April 2016, she had her own phone that Kim had paid for and that it had been operational. Kim said that Hallman's phone had been left in his vehicle, but she then agreed that Amy "probably did take his phone." Kim said that the phone on which the text messages had been exchanged had become obsolete and would no longer activate and that she had never forwarded the messages or done anything else to preserve them. Kim did not show Detective McKee any of the text messages or provide any of them to the district attorney's office.

Kim denied having ever told Amy that she had reported her concerns about the sexual abuse of Amy to the police in August 2014.

### c. Officer G. Garcia's Testimony

Fort Worth Police Officer G. Garcia was on duty on August 9, 2014, when he was dispatched around 3 p.m. to the Bandy Street house for a domestic disturbance in which Kim was the suspect and Hallman was the victim. He talked to Kim, who never mentioned any concern to him about sexual abuse of Amy or Rita. Officer Garcia testified that if sexual abuse is reported to him, he refers it to a specialist more qualified to handle interviewing children. No arrests were made on August 9, and he was not part of the response to the call the next day. He stated that Kim had some outstanding warrants at the time and that she had been given the option to leave.

### d. Detective Robles's Testimony

Detective Robles had worked for the Fort Worth Police Department from August 2008 to July 2015. He was dispatched on August 10, 2014, to the Bandy Street house for a domestic disturbance with Officer Oakley as his assisting officer. He testified as follows during his direct examination:

> Q. In the course of your response and interviewing people, did [Kim] ever say to you that she had a concern that one of her children was being sexually abused?
>
> A. No, ma'am, she never said anything to me.
>
> . . . .

Q. And was there any mention to Officer Oakley that [Kim] was concerned that one of her daughters -- or one of her children was being sexually abused?

A. No, ma'am.

Q. And if that had happened, what would you have done?

A. We would have investigated further.

Q. All right. And so no mention of sexual abuse by [Kim]?

A. Not to me, no, ma'am.

Q. And not to Officer Oakley?

A. No, ma'am.

Q. And there were no other officers that responded?

A. I don't believe so, no, ma'am.

On cross-examination, Detective Robles testified that he neither had an independent recollection of the case nor recalled what Amy or Kim looked like. He did not recognize Hallman. He did not recall whether the scene had been emotional.

### e. Tarrant County College Coordinator's Testimony

Yolanda Sifuentes, special projects coordinator at TCC's Family Empowerment Center, testified that her department helps students who need housing, food, medical, or other assistance. She met with Hallman on March 8, 2016, at 10:52 a.m., without an appointment, recalling that it had been "an extreme circumstance, so [she] stopped what [she] was doing to see this student." Hallman had his sixteen-year-old daughter

with him, and he told Sifuentes that they were homeless. She made some calls but was unable to help them find a place to stay.

Sifuentes testified that Hallman had told her that he and his wife were going through a separation and that the previous Sunday, his wife, who had been diagnosed with bipolar disorder, had physically abused the sixteen-year-old, so he had removed her from the situation. Sifuentes said that there was nothing in the daughter's demeanor that caused her any kind of concern and that if she had been concerned, she would have asked to speak alone with Hallman's daughter. She stated, "I didn't see any red flags"; however, she admitted on cross-examination that she had only observed them for an hour, that Hallman did all the talking, and that Hallman did not mention any prior CPS history. On redirect, Sifuentes stated that the college had video surveillance of the parking lots and the center where she works and that the video surveillance is controlled by the police department.

**5. Closing Arguments**

The prosecutor praised Amy's and Rita's strength and courage and said that the defense would probably focus on inconsistencies in their testimonies, as well as irrelevant distractions such as the lack of DNA and forensic evidence. The defense responded that the State was presumptuous to say that information is irrelevant when it is up to the jury to decide if something matters.

The defense argued that Detective McKee should have done a better job of checking facts, looking into the family's CPS history, and asking Kim for access to

Hallman's vehicle before she sold it to CarMax. The defense also argued that it made no sense for someone who was allegedly abusing two children to call the police and CPS to the house and run the risk of an outcry and that Hallman's objective behavior—going to church and school—was "absolutely consistent with not sexually abusing [Amy and Rita]." The defense attacked Amy's and Rita's credibility, reminded the jury of how many times the girls had denied any sexual abuse, and pointed out that there was no mention that their grades had suffered, that they had lost weight, that they had become promiscuous, or that they had engaged in self-destructive behavior—all of which would have been consistent with chronic sexual abuse. The defense asked why, if Hallman was home most of the day, he would wait until nightfall, when Kim was home, to abuse the girls.

In rebuttal, the prosecutor stated that as to Detective McKee, "I wish he would have tried. I wish he would have done a better job" but that all DNA evidence from the house would have shown was that Hallman had lived there, and "[y]ou would expect to see his DNA in that house." She told the jurors that child sexual abuse cases come "down to do you believe them or not" and reminded the jury of some of the details.

### 6. Conclusion

The jury's responsibility to assess the credibility of Amy, Rita, and Kim was interwoven from voir dire through the guilt–innocence closing arguments, and everyone knew that this was a he-said, she-said case in which witness credibility would

74

ultimately determine the outcome. Although the State complains that the August 10, 2014 extraneous offense was irrelevant to the guilt–innocence determination on whether Hallman had sexually abused Amy and Rita, there was no better evidence with which to impeach Kim's testimony about her sexual-abuse suspicions than her own written words and the observations in the family-violence packet made by the officers at the scene on August 10, 2014. That is, while Kim claimed at trial that on August 10, 2014, she had told the police that she suspected Hallman was sexually abusing Amy, her own written statement clearly demonstrates otherwise. Likewise, her claim that the children had been upset on August 10, 2014, was contradicted by the descriptions of their demeanors as "calm" in the family-violence packet.

Further, while Kim testified that Hallman had threatened to kill them if they ever sent him to jail, no one checked "threat of physical violence" or "sexual assault" in the list of incident descriptors in the family-violence packet. Contrary to Officer Robles's testimony and the undisclosed family-violence packet, Amy testified that when Hallman was arrested on August 10, 2014, the officers had asked her if Hallman had ever been sexually abusive to her and that she said no. Kim's and Amy's accounts about the conversation with police on August 10, 2014 were similar, and their credibility was linked despite other discrepancies in their testimonies, such as Amy's statement that Kim had stayed in her bedroom across from Amy and Rita's bedroom in the Bandy house and Kim's statement that she had stayed in a converted garage

75

separate from the main portion of the Bandy house. The jury convicted Hallman of the counts that involved only Amy.

Kim's undisclosed August 10, 2014 written statement and the family-violence packet, when combined with the curious timing of Rita's and Amy's delayed outcries,[47] the filing of Kim's May 2016 divorce petition, in which Kim did not mention any alleged sexual abuse, and some of the discrepancies in her testimony demonstrate that the jury was deprived of critical-but-undisclosed credibility evidence during the guilt–innocence phase of trial.

As Hallman has pointed out, we previously concluded that his substantial rights were affected by the State's untimely disclosure of the impeachment evidence. Notwithstanding the State's arguments on remand, the record reflects that the jury's decision was adversely affected by Hallman's being deprived of the opportunity to cross-examine Kim during guilt–innocence with her own written words that contradicted her testimony and highlighted her questionable credibility. Under *Mosley*, the nonconstitutional harm that Hallman suffered was severely prejudicial during the critical guilt–innocence portion of the case. In light of all of the evidence and the case's theories set out above in full, Hallman's conviction beyond a reasonable doubt, absent the misconduct, was not certain. Accordingly, we conclude that the elected

---

[47]Again, the first delayed outcry (Rita's) occurred three days after Amy left home with Hallman, and the second delayed outcry (Amy's) occurred the day before Hallman's trial on Rita's allegations, for which Rita had been reluctant to testify.

judge abused her discretion when she denied the motion for mistrial and that the resulting harm affected Hallman's substantial rights. Accordingly, we sustain Hallman's sole point.

## IV. CONCLUSION

Having sustained Hallman's sole point, we reverse the trial court's judgment and remand this case for a new trial.

/s/ Mike Wallach
Mike Wallach
Justice

Publish

Delivered:  June 16, 2022